**EHLINGER & ASSOCIATES, et al.**

v.

**LOUISIANA ARCHITECTS ASSOCIATION, et al.**

No. Civ.A. 96–2413.

United States District Court, E.D. Louisiana.

Jan. 5, 1998.

Earl S. Eichin, Jr., O'Neil, Eichen, Miller, Saporito & Harris, New Orleans, LA, George Frazier, Lemle & Kelleher, New Orleans, LA, for Plaintiffs.

James Rodney Chastain, Jr., Breazeale, Sachse & Wilson, Baton Rouge, LA, Marshall G. Weaver, Arthur, Arthur S. Patron, Jr., Henican, James & Cleveland, Metairie, LA, for Defendant Louisiana Architects Ass'n.

Daniel Lund, Brett A. North, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Defendant American Institute of Architects.

### ORDER AND REASONS GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

VANCE, District Judge.

This matter is before the Court on motions for summary judgment filed by defendants American Institute of Architects and Louisiana Architects Association. For the reasons set forth below, the motions are GRANTED.

### I. BACKGROUND

Plaintiff, Ladd Ehlinger, a Louisiana-licensed architect, and his firm, Ehlinger & Associates ("E & A"), brought this suit against the Louisiana Architects Association ("LAA") and the American Institute of Architects ("AIA") asserting violations of the federal and state antitrust laws and the Louisiana Unfair Trade Practices Act. Ladd Ehlinger also claims that defendants defamed him. The gravamen of plaintiffs' complaints concerns the failure of the Louisiana Architects Selection Board ("LASB"), an entity authorized by law to select architectural firms on state projects, to award E & A state contracts with the frequency they assert was appropriate.[1] Plaintiffs complain that the

---

1. Plaintiffs' dissatisfaction with the LASB selection process has a long history. Ehlinger complained to the governor's office that E & A had been "blackballed" by the LASB in 1985 and again in 1991. AIA Mem., Exh. 29, Dep. of Mr. Ehlinger at 444, *id.* at 469. Plaintiffs filed a lawsuit in 1984 over the award of a project. *Id.* at 280–81. As early as 1984, Ehlinger complained to the Justice Department about the matters at issue in this lawsuit, specifically accusing the AIA and the LAA of violating the antitrust laws by boycotting him through control of the LASB. *Id.,* dep. Exhs. 18, 23.

LAA, consisting of one-half of the licensed architects in the State of Louisiana, controls the selection of architects by the Louisiana Architects Selection Board. They claim that the LASB "disproportionately favors" two categories of architectural firms: (1) those purchasing professional liability and other forms of insurance from or through the LAA and its executive director, Richard Thevenot; and (2) those LAA members who have been or will be "of service" to the LAA. In response to discovery, plaintiffs assert that those LAA members who are "of service" to the LAA include LAA "insiders," who are defined as persons who held LAA offices, served on important LAA committees, won honor awards, or contributed to the LAA's political action committee. Plaintiffs assert that they suffered an almost total loss of state work after they decided not to buy insurance from the LAA and after Mr. Ehlinger resigned from the LAA and its New Orleans chapter. Plaintiffs challenge the LASB selection practices as subjective and lacking qualification-based standards.

Plaintiffs assert that their exclusion from state contracts amounts to a group boycott by the LAA in violation of Section 1 of the Sherman Act. Additionally, plaintiffs claim that the LAA conditioned receipt of state contracts on the purchase of insurance, which they claim is an illegal tie-in, also in violation of Section 1 of the Sherman Act. Plaintiffs further claim that the LAA monopolized the market for architectural services provided to the State of Louisiana in violation of Section 2 of the Sherman Act by manipulating the voting process of the LASB and abusing its "right to have a majority of LASB" members. In their briefs, plaintiffs claim that the LAA used the asserted boycott and tying arrangement to maintain its monopoly under Section 2.

Plaintiffs have not alleged that the AIA directly participated in the conduct charged against the LAA. Rather, plaintiffs seek to impose liability on the AIA on a theory of agency, asserting that the LAA is a component of the AIA and that plaintiffs believe that the LAA represented and acted for the AIA, that the AIA oversaw the LAA's conduct, and that plaintiffs relied on the AIA to rectify the LAA's improper actions toward them. Plaintiffs assert that they complained to the AIA of the LAA's conduct and that the AIA failed to correct it.

Plaintiffs claim that the same conduct violated the Louisiana Unfair Trade Practices statute. Further, Mr. Ehlinger asserts that the defendants defamed him because the minutes of the LASB contained statements that he falsified applications for state work.

 Both the LAA and the AIA have filed motions asserting that plaintiffs' case should be dismissed on a number of grounds. Specifically they assert that plaintiffs' claims are prescribed under federal and state law, that the LASB's actions are immune from antitrust attack under the state action doctrine, that any effort by the LAA to influence the LASB is protected by the *Noerr–Pennington* doctrine, or that, if the LAA and the LASB are one and the same, as plaintiffs allege, that the LAA likewise is protected by the state action doctrine. Defendants also assert that plaintiffs cannot prove an antitrust violation in any event. Defendants further state that plaintiffs have failed to assert a defamation claim. Finally, the AIA claims that there is no basis for holding it liable under a theory of agency liability. Because the Court determines that the state action doctrine disposes of the federal and state antitrust law claims, as well as the Louisiana Unfair Trade Practices Act claims, it will not reach all of the alternative arguments for dismissal.[2] The Court does find an absence

---

**2.** Although the Court disposes of all of the antitrust claims on other grounds, the Court notes that plaintiffs' tie-in claim is defective as a matter of law. A tying arrangement is "an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518,

2 L.Ed.2d 545 (1958). Here, the architects who were allegedly forced to buy insurance from the LAA and its executive director did not do so as a condition of being able to *purchase* another product. Further, the defendants are not alleged to be sellers of the tying product, which is the award of state architectural work. Moreover, there is no allegation that the alleged restraint had an anticompetitive effect on the insurance (tied) product market, a prerequisite in the Fifth

of any basis supporting a theory of agency liability on the part of the AIA and that the defamation claim is deficient as a matter of law.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when there is no genuine issue as to any material facts, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Factual controversies are resolved in favor of the non-moving party only if there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). The court must determine whether there are any genuine issues of material facts which preclude judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## III. *FEDERAL ANTITRUST CLAIMS*

■ Plaintiffs allege that the LAA controls the LASB and that they are one and the same. *See* Pls.' Opp. at 41. Indeed, although plaintiffs have not sued the LASB, the essence of their antitrust and unfair trade practices claims against the defendants is the failure of the LASB to award plaintiffs architectural contracts on state projects to the extent plaintiffs believe would have occurred but for defendants' allegedly anticompetitive behavior. Because these allegations clearly challenge how the state board's selection process operates, they necessarily implicate the state action doctrine announced by the United States Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the United States Supreme Court held that restraints on competition imposed by "state action or official action directed by a state" were immune from the antitrust laws based on considerations of federalism and state sovereignty. *Id.* at 351, 63 S.Ct. at 314. The Court must reach the issue of whether the LASB's selection process is immune from antitrust challenge before it can determine whether the LAA can be held liable for its members' conduct in influencing or carrying out the Board's policies or benefitting from its selection process.

■ Although the state action doctrine originally applied to actions by the state itself, the doctrine has been extended under certain circumstances to anticompetitive activities of subordinate governmental units of a state, such as municipalities, state agencies, and other political subdivisions. In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the United States Supreme Court held that immunity will attach to the conduct of such subordinate governmental units when they are implementing a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation or monopoly public service. *Id.* at 410, 98 S.Ct. at 1135. The Court further held that for state policy to be "clearly articulated," subordinate state actors need not show a specific, detailed legislative authorization of the anticompetitive governmental activity, if the authority granted to the governmental unit suggests the legislature contemplated that the disputed action would be taken. *Id.* at 415, 98 S.Ct. at 1138.

■ The Supreme Court shed more light on the "clear articulation" requirement in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 40, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985). In *Hallie,* neighboring townships challenged the City of Eau Claire's refusal to provide sewer treatment to the towns, while offering to provide the same services to individual homeowners if they voted to have their homes annexed by the city and to use the city's sewerage collection and transportation services. The townships charged that the city was using its monopoly over sewerage treatment to gain a monopoly over sewerage collection and transportation services. The city claimed immunity under the state action doctrine, asserting that the conduct had been authorized by state legislation granting the city the right to construct and operate sewerage systems, to define sewer-

Circuit to an illegal tie-in. *See, e.g., Crossland v.* *Canteen Corp.,* 711 F.2d 714, 722 (5th Cir.1983).

age districts, and to decide whether to service unincorporated areas. The Supreme Court held that the city's anticompetitive conduct was immune under the state action doctrine because it was "a foreseeable result" of the city's authority to refuse service to unincorporated areas. *Id.* at 42, 105 S.Ct. at 1718. *Accord City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 372–73, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991). This was so even though the legislation did not expressly authorize the city to tie the use of its treatment facility to the use of its collection and transportation services. The Supreme Court also established in *Hallie* that when a municipality is acting pursuant to a clearly expressed state policy, it is immune from antitrust liability even if the state did not actively supervise the execution of the policy. *Hallie*, 471 U.S. at 47, 105 S.Ct. at 1720. Further, in a footnote, the Court indicated that when the actor is a state agency, it is "likely" that active supervision will also not be required. *Id.* at 46 n. 10, 105 S.Ct. at 1720 n. 10.

■ The Fifth Circuit Court of Appeals has made clear that special purpose state agencies may enjoy state action immunity under the same terms as municipalities. In *Benton, Benton & Benton v. Louisiana Public Facilities Authority*, 897 F.2d 198 (5th Cir.1990), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1619, 113 L.Ed.2d 717 (1991), a law firm sued the Louisiana Public Facilities Authority, two law firms and a lawyer, claiming that they conspired to monopolize the business of providing bond counsel services on the Authority's bonds issues. The Fifth Circuit affirmed the district court's application of state action immunity to all of the defendants, as well as its holding that active supervision was not required for a special purpose public agency to assert state action immunity. In *Benton*, the Authority was authorized by law to issue "conduit" bonds in its name to finance private projects in which the government had no interest or obligation of repayment. The Authority had no taxing power, and although the bonds were issued in its name, repayment was to come from the revenues of the projects financed.

In holding that the Authority and the private parties acting pursuant to its decisions were shielded from antitrust liability under the state action doctrine, the court concluded that the Authority was a special purpose public agency created by the state, which performed a public function. *Id.* at 199–200. In so doing, the court relied on the trial court's determination that the Authority was a trust created under state law as a "public corporation," that it was authorized to provide funding for projects that had a public purpose, that its trustees took an oath of office and were removable for malfeasance, and that its meetings and records were required to be open to the public. *Id.* at 200, 203. Further, its bond issues had to be approved by the state bond commission, and its attorneys' fees were subject to approval by the attorney general. *Id.* at 203.

Other cases have likewise held that special purpose public entities that are instrumentalities of a state or a municipality do not require state supervision to enjoy state action immunity, provided they satisfy the "clear articulation" requirement of *Hallie*. *See Martin v. Memorial Hosp. at Gulfport*, 86 F.3d 1391 (5th Cir.1996) (county and municipal hospital authorities); *Crosby v. Hospital Auth. of Valdosta and Lowndes County*, 93 F.3d 1515 (11th Cir.1996) (same), *cert. denied*, —— U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997); *Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073 (1st Cir.1993) (public waste disposal corporation); *Ambulance Serv. of Reno, Inc. v. Nevada Ambulance Serv., Inc.*, 819 F.2d 910, 912–13 (9th Cir.1987) (regional emergency medical services authority created by county board of health); *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1046 (2d Cir.1986) (urban development corporation).

■ When the action at issue is not taken by an instrumentality of the state, such as a municipality, state agency or other subordinate political unit, but by private parties who claim that their anticompetitive conduct is authorized by state law, the Supreme Court requires that a two-part test be satisfied before state action immunity will attach:

First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself.

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (internal quotations omitted); *see FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). Thus, under this scenario, the private party must satisfy not only the "clear articulation test" but also the requirement that the state actively supervise the conduct at issue to assure that it is a product of deliberate state action and not simply the agreement of private parties. *See Ticor*, 504 U.S. at 634–35, 112 S.Ct. at 2177 (when prices are set as initial matter by private parties subject only to state veto, private parties must show that state took steps to determine specifics of price-fixing scheme).

■ Plaintiffs contend that the LASB is not entitled to state action protection because it does not have a clearly articulated and affirmatively expressed mandate from the state to displace competition in the selection of architects and because its actions are not supervised by the state. Rather, plaintiffs appear to assert that the Board's action is actually private action or that the "LAA is the LASB." Pls.' Opp. at 41. In order to address the status of the LASB under the state action doctrine, the Court must look to Louisiana's statutory scheme governing architect selection on state projects.

### A. *The LASB*

The Louisiana Architect Selection Board was created by Act 721 of 1975, as amended by Act 525 of 1976. The stated purpose of Act 721 was "to provide for the selection of persons to perform certain professional services for public contracts; ... to create professional service selection boards and to provide for their membership, powers, duties and functions." La.Acts 1975, No. 721. By statute, the LASB is comprised of six members, four of whom are architects elected in an election conducted by the Louisiana State Board of Architect Examiners in which all Louisiana-licensed, resident architects are eligible to vote. La.R.S. § 38:2311(A). The other two members of the LASB consist of a representative of the user agency and the Director of the Facility Planning and Control Department of the Office of the Governor. *Id.* Elected members serve one-year terms, are removable for cause, may not serve more than two consecutive one-year terms, and may not do business with the State during their tenure on the LASB and for six months thereafter. *Id.* § 2311(B), (C). Board members are deemed public servants for purposes of the Louisiana Code of Ethics. *See* La.R.S. §§ 42:1102–1169; Pls.' Opp., Exh. 27. Board members take an oath of office prior to serving on the LASB. The LASB takes action by majority vote. La.R.S. § 38:2311(D).

The Legislature granted the LASB authority to adopt rules and regulations, after notice and hearing, to carry out its statutory purposes. *Id.* § 2311(E). The Division of Administration of the State of Louisiana, a division of the Office of the Governor, provides the Board funding, facilities, office space and staffing in Baton Rouge, Louisiana.[3] *Id.* § 2311(G). Board members serve without compensation, and the LASB is required to make selections based on "a formal written qualification-based selection procedure." *Id.* § 2311(H), (I).

The LASB is not a price-fixing body. Architectural fees on state projects are established by the Division of Administration. La. R.S. § 38:2312. The architectural selection process is exempt by law from statutes requiring competitive public bidding. La.R.S. § 39:1554(B), 1556. Price competition is not a factor in the selection process. The statute states that it is "generally desirable to allocate ... work among persons who are desirous and qualified" to do it. La.R.S. § 38:2313(B)(4).

Under the statutorily mandated selection process, state agencies which intend to contract for architectural services must notify the Division of Administration. *Id.*

---

**3.** Under Louisiana law, the Division of Administration has broad authority over the administrative functions of the State and its agencies. *See* La.R.S. 39:1, 4.

§ 2312(A). The Division of Administration then refers the project to the LASB. The LASB advertises the project in an official state journal, identifying the professional services required, the user agency, the time frame and instructions for applications, a general description of the project, the availability of details upon request, the project's time parameters and budgetary requirements, and the fee, "which shall be determined by the Division of Administration." *Id.* Applicants must submit data on their experience, previous and current projects performed for the state, scope and amount of work on hand, names of key personnel who would be assigned to the project, and other information required by the LASB. *Id.* § 2312(B).

The statute establishes a nonexclusive list of selection criteria to be used by the LASB in selecting architects on state projects: professional training and experience for the type of project; capacity for timely completion in light of workload and manpower; past and current professional accomplishments; nature, quantity and value of state work previously and currently being performed; past performance on public projects, including whether the work involved litigation, time delays, cost overruns or design defects for which the architect was accountable, as determined by the Facility Planning and Control Department. *Id.* § 2313(B). In addition, the Board is granted the authority to develop additional qualifications and guidelines specific to each project. *Id.* § 2313(C). The statute forbids architects from paying anyone contingent fees to solicit state work. *Id.* § 2314.

Pursuant to its statutory authority, the LASB has promulgated regulations codified in the Louisiana Administrative Code for the conduct of its business. *See* 4 La.Admin.Code Ch. 1, §§ 101–41. The regulations provide that all meetings are to be held in public, and they provide a right of public inspection of LASB records. *Id.* §§ 111, 133. In addition, the regulations provide for officers of the LASB, as well as a procedure for voting on applicants, for taking emergency action, and regulating communications by applicants with Board members during the selection process. *Id.* §§ 109, 117, 127, 129, 131.

### B. *The LASB is a State Agency*

Although plaintiffs assert that the LASB is "independent of the state," the legislation creating the Board belies that assertion. The LASB is designated by law as an agency in the office of the governor in the executive branch of state government. *See* La.R.S. § 36:4. Under Louisiana law, a state agency is an agency created by the legislature or the constitution. *Mullins v. State,* 387 So.2d 1151 (La.1980). In this case, state law provides for the membership, terms of office, powers, duties and functions of the LASB. The Board holds public meetings and its records are public. Its members are subject to discipline under the state ethics code as public servants. They are disqualified from doing business with the State during their tenure of office. The function performed by the LASB—the selection of architects for state projects—is an executive function of state government. The Court concludes that the LASB is clearly an agency of the state.

The LASB also acts pursuant to a clearly articulated and affirmatively expressed mandate to supplant competition with regulation. Architect selection is exempt from competitive bidding laws. *See* La.R.S. §§ 39:1554(B), 39:1556. The architect selection statute expressly states a purpose "to allocate work" among firms qualified to do it. *Id.* § 2313(B)(4). It establishes statutory selection criteria, which do not even include price competition. Indeed, the law provides that the Division of Administration is to set the architectural fees on state architectural contracts. By authorizing the LASB to award contracts without regard to price competition and to "allocate work among those desirous and qualified" to do it, the legislation clearly foresaw that competition in the economic sense would be displaced in favor of the regulatory scheme established by the statute.

Because the Court finds that the LASB is a state agency acting pursuant to a clearly articulated and affirmatively expressed state policy to supplant competition with regulation, under *Hallie,* state supervision of its

decisions is not a requirement for its protection by state action immunity. Further, state action immunity is not dependent upon how well the Board carries out its statutory mandate. It is not for this Court to evaluate whether the Board equitably allocates state work under the statute. The Supreme Court established in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), that antitrust immunity is not negated if the public body fails to adhere to the substantive requirements of its authorizing statute. *Id.* at 372, 111 S.Ct. at 1350.

Even if active supervision by the state were required, the Court finds that such supervision is provided in the regulatory framework establishing the LASB and its powers and duties. The statute regulates the terms of members, grounds for removal, and establishes prohibited activities. It denies the LASB pricing authority, which it vests in the Division of Administration. The statute further establishes explicit criteria for the selection of architects and provides for the involvement of the Department of Facility Planning and Control in evaluating architects' prior performance for the state. At least one member of the Board has, in fact, been disciplined by the state ethics board for infractions of the statute. *See* Pls.' Opp., Exh. 27. The Court finds that adequate state supervision exists, even if it were required.

## C. *Liability of the LAA and the AIA*

In this case, if the LASB selection process is protected by state action immunity, plaintiffs cannot end-run that immunity by suing the architects' association whose members have been awarded state work by the Board or who carry out the Board's policies by serving as LASB members. Indeed, plaintiffs challenge the Board's selection decisions, its position prohibiting nonwritten communications with Board members about upcoming projects, and the application form it has adopted by regulation, claiming that all of these were actions of the LAA. A number of cases have recognized that when private parties carry out the policy of the state as agents of public agencies, or when they are

necessarily involved in the state-sanctioned activity, they are likewise protected by state action immunity. In *Benton, Benton & Benton v. Louisiana Public Facilities Authority*, 897 F.2d 198, 199 (5th Cir.), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1619, 113 L.Ed.2d 717 (1991), the attorneys who were selected by the Authority to act as bond counsel were shielded by the Authority's state action immunity. Similarly, in *Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073, 1079 (1st Cir.1993), the court held that when the protected state entity makes a choice that is protected by state action immunity, to treat the mere receipt of such authorized choice as wrongful would undermine *Parker* protection. Similarly, in *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032 (2d Cir.1986), the court held that it would defeat the purpose of state action immunity to allow plaintiffs to prevent awards to private parties when the awarding authority is protected by the state action doctrine by simply suing the third parties. The court stated "when the UDC accomplishes its goal in a protected manner, and the participation of private third parties was reasonably contemplated by the legislature, allowing successful tangential attacks on the UDC's activities through suits against the third parties would effectively block the efforts of the UDC." *Id.* at 1048. Accordingly, this Court finds that LAA members who carried out the LASB's policies as LASB members or who were awarded state projects by the LASB are protected by state action immunity. If the individual members of the LAA cannot be liable for this conduct, neither can the LAA as an organization. Further, since the liability of the AIA as an alleged principal is dependent on the liability of its alleged agent, the LAA, the AIA cannot be held liable if its alleged agent is exempt from antitrust attack.

▆ Alternatively, the actions of the LAA in seeking to influence the LASB are protected from antitrust challenge under the *Noerr–Pennington* Doctrine. Plaintiffs claim that the LAA has controlled the selection of architect members of the LASB by nominating candidates for open positions who are not opposed, that the LAA has monitored voting patterns of Board members, and that the

LAA proposed an application form, which the LASB adopted by regulation. These assertions are nothing more than allegations that the LAA sought to influence the LASB and succeeded.

■ The United States Supreme Court has held that private efforts to solicit competition-restricting government action may be immune from antitrust challenge. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (lobbying effort to obtain legislation to restrict competition protected by absolute antitrust immunity regardless of anticompetitive motive); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (efforts to influence government administrative process protected from antitrust challenge). These decisions are based on the Court's solicitude for First Amendment petitioning rights and because the Sherman Act was designed to regulate business activity, not political activity. See *Noerr*, 365 U.S. at 137–38, 81 S.Ct. at 529–30. The immunity extends to efforts to influence legislative, administrative, judicial and adjudicatory actions. *See Noerr*, 365 U.S. 127, 81 S.Ct. 523 (legislative action); *Pennington*, 381 U.S. 657, 85 S.Ct. 1585 (administrative processes); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (judicial and adjudicatory actions). Indeed, there is no exception to *Noerr* immunity even if plaintiffs claim that private parties conspired with public officials to produce anticompetitive action. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (holding that there is no conspiracy exception to either state action immunity doctrine or *Noerr–Pennington* doctrine). *Omni* suggested that other regulatory mechanisms

(such as antibribery statutes or conflict of interest prohibitions) are superior to the antitrust laws as tools for regulating behavior in the political marketplace.[4] While plaintiffs contend that the LASB's action is not state action, they concede that if it were, defendants' conduct would be protected by *Noerr* immunity. *See* Transcript of Hearing, Nov. 13, 1997, at 36. Accordingly, the Court alternatively finds that the LAA is protected by *Noerr* immunity. Absent liability by the LAA, its alleged principal, the AIA, is likewise not liable to plaintiffs under the federal antitrust laws.

## IV. *STATE ANTITRUST LAW CLAIMS*

■ It would indeed be anomalous to hold that state legislation that clearly articulated a policy to supplant competition with regulation intended that persons acting pursuant to that policy would be liable under the state antitrust laws. Indeed, the court in *Airline Car Rental, Inc. v. Shreveport Airport Authority*, 667 F.Supp. 303, 308 (W.D.La.1987), held that defendants who were immune from federal antitrust challenge because of the state action doctrine were likewise immune under the Louisiana antitrust statutes. Further, in *Reppond v. City of Denham Springs*, 572 So.2d 224 (La. App. 1st Cir.1990), the Louisiana First Circuit Court of Appeal adopted the federal standard for determining whether a municipality was immune under the state antitrust laws. *See id.* at 229 ("sound reasoning supports the approach taken by federal jurisprudence.... and [we] find immunity from the state antimonopoly statutes will only extend to local government activities which are performed pursuant to a state policy to displace competition with regulation"). One alternative ground for this Court's ruling that the LAA is not liable under the federal antitrust

---

**4.** *Omni* left open the possibility that state action immunity and *Noerr–Pennington* protection might not apply when the state acts as a commercial participant. *Omni*, 499 U.S. at 374–75, 379, 111 S.Ct. at 1350–51, 1353–54. However, the Fifth Circuit has rejected a commercial participant exception to *Noerr–Pennington* immunity. *See Greenwood Util. Comm'n v. Mississippi Power Co.*, 751 F.2d 1484 (5th Cir.1985). The court reasoned that administering a commercial exception to *Noerr* immunity would be difficult if

not impossible when the government engages in a policy decision and at the same time acts as a participant in the marketplace. *Id.* at 1498–1500. The Fifth Circuit has also rejected a commercial participant exception to the state action doctrine. *See also Limeco, Inc. v. Division of Lime*, 778 F.2d 1086, 1087 (5th Cir.1985) (no commercial participant exception to *Parker* doctrine). These precedents continue to bind this Court.

laws is that the LAA is protected under the umbrella of the LASB's state action immunity. Based on the cases and reasoning cited *supra,* the Court finds that the LAA is likewise immune under the state antitrust laws.

The Court alternatively found the LAA immune under the *Noerr–Pennington* doctrine. As noted, the *Noerr–Pennington* doctrine is predicated on a private citizen's petitioning rights under the First Amendment and on the principle that the antitrust laws were not designed to govern political activity. The Louisiana antitrust laws were patterned after the federal antitrust laws, and Louisiana courts have generally found federal precedent to be persuasive in interpreting the state antitrust statutes. *See* La.R.S. §§ 51:121–152; *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So.2d 1149, 1153–60 (La.1986); *Loew's, Inc. v. Don George, Inc.,* 237 La. 132, 110 So.2d 553, 558 (1959); *Reppond,* 572 So.2d at 228. This should be particularly true with the *Noerr–Pennington* defense, given its constitutional underpinnings. Accordingly, the Court holds that the *Noerr–Pennington* doctrine provides the LAA a defense to liability under the state antitrust laws. Further, the AIA is not liable under the state antitrust laws because its alleged agent is not liable.

## V. *LOUISIANA UNFAIR TRADE PRACTICES ACT*

 Plaintiffs claim that defendants' conduct violates the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La.R .S. § 51:1405. The thrust of the LUTPA is to deter injury to competition. *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1331 (5th Cir.), *cert. denied,* 513 U.S. 815, 115 S.Ct. 71, 130 L.Ed.2d 26 (1994). The Act does not apply to "any conduct which complies with Sections 5(a)(1) of the Federal Trade Commission Act [15 U.S.C. § 45(a)(1) ], as from time to time amended, any rule or regulation promulgated thereunder and any finally adjudicated court decision interpreting the provisions of said act, rules and regulations." La.R.S. 51:1406(4). Thus, the statute does not purport to reach conduct that cannot be used to establish liability un-

der Section 5 of the Federal Trade Commission Act.

In *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), the Supreme Court assumed that the state action doctrine could be asserted as a defense to a suit brought by the Federal Trade Commission under Section 5 of the FTC Act, although it found the defense unavailing on the facts of the case. *Id.* at 635, 112 S.Ct. at 2177–78. Here, this Court has determined that the state action doctrine shields the LAA from liability under the Sherman Act. For this reason, it would likewise shield it from liability under the FTC Act. The LAA's exemption from liability under the FTC Act prevents it from being held liable under the LUTPA. *See Helen Brett Enters. v. New Orleans Metro. Convention & Visitors Bureau, Inc.,* Civ.A. No. 95–2888, 1996 WL 346314, at *7–8 (E.D.La. June 25, 1996).

Similarly, in *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), the Supreme Court assumed that *Noerr–Pennington* immunity could be asserted as a defense to an action by the FTC under Section 5 of the Federal Trade Commission Act, although it found the defense inapplicable. *Id.* at 424–25, 110 S.Ct. at 776. This Court has found alternatively that the LAA is entitled to *Noerr–Pennington* immunity. Hence, it cannot be held liable under either the Sherman Act or the Federal Trade Commission Act. For this reason, it likewise cannot be held liable under the LUTPA. *See Helen Brett Enters.,* 1996 WL 346314, at *8. For these reasons, the Court finds that the LAA is entitled to summary judgment on plaintiffs' LUTPA claims. As plaintiffs' LUTPA claims against the AIA are dependent on the liability of its alleged agent, the LAA, there can be no LUTPA liability on the AIA when the LAA is not liable. Accordingly, summary judgment is also granted dismissing plaintiffs' LUTPA claims against the AIA.

## VI. *AGENCY RELATIONSHIP BETWEEN THE AIA AND THE LAA*

 Although the rulings set forth above dispose of the AIA's antitrust and LUTPA liability, the Court alternatively finds that

the AIA cannot be held liable under agency theory even if the LAA were not immune from liability. Plaintiffs allege that the AIA is responsible for the anticompetitive actions of its members and components. *See* Amended Compl. ¶ 102. Specifically, plaintiffs contend that the AIA is liable for the acts of the LAA under the doctrine of apparent authority. In Louisiana, an agency relationship is created by express appointment under La.C.C. art. 2985 or by implied appointment arising from apparent authority. *Cross v. Cutter Biological,* 676 So.2d 131, 147 (La.App. 4th Cir.1996), *writ denied,* 685 So.2d 142 (La.1997); *Duplessis Cadillac, Inc. v. Creative Credit Servs., Inc.,* 564 So.2d 336, 338–39 (La.App. 1st Cir.1990). Plaintiffs do not contend that an express appointment exists between the AIA and the LAA. Rather, plaintiffs rely on the doctrine of apparent authority.

It is well settled in Louisiana that "[i]mplied or apparent agency exists if the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal." *Urbeso v. Bryan,* 583 So.2d 114, 117 (La.App. 4th Cir. 1991). *See Cross,* 676 So.2d at 147; *Craft v. Trahan,* 351 So.2d 277, 281 (La.App. 3d Cir. 1977). As the Supreme Court of Louisiana stated:

> For the doctrine of apparent authority to apply, the principal must first act to manifest the alleged agent's authority to an innocent third party. Second, the third party must rely reasonably on the manifested authority of the agent.... [T]he principal will be bound for the agent's actions if the principal has given the innocent third party a reasonable belief the agent had authority to act for the principal.

*Boulos v. Morrison,* 503 So.2d 1, 3 (La.1987). *See Cross,* 676 So.2d at 147 ("Apparent agency arises when the principal acts in such a manner as to give an innocent third party the reasonable belief that the agent has the authority to act for the principal."). Apparent agency is established "by the words and conduct of the parties and the circumstances of the case." *Self v. Walker Oldsmobile Co., Inc.,* 614 So.2d 1371, 1375 (La.App. 3d Cir. 1993). *See Urbeso,* 583 So.2d at 117 (same).

An agency relationship may be created even though there is no intention to do so. *Cross,* 676 So.2d at 147; *Self,* 614 So.2d at 1375; *Urbeso,* 583 So.2d at 117. However, "[a] third party seeking to benefit from the doctrine of apparent authority may not blindly rely upon the assertions of an agent. He has a duty to inquire into the nature and extent of the agent's power." *Boulos,* 503 So.2d at 3. Finally, the party seeking to bind the principal has the burden of establishing the existence of the agency relationship. *Boulos,* 503 So.2d at 3. The question of apparent authority thus turns on whether the principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority.

In this case, plaintiffs attempted to craft their Amended Complaint to satisfy the doctrine of apparent authority. For instance, plaintiffs allege that they reasonably believed that the LAA represented and acted for the AIA. Amended Compl. ¶¶ 103(a), 104(a). Further, plaintiffs allege that Mr. Ehlinger detrimentally relied on his belief that the AIA would remedy his problems with the LAA. *Id.* at ¶ 104(f)–(h). Plaintiffs state that the AIA and the LAA have the same membership. *Id.* at ¶ 105. Although plaintiffs acknowledge that the Bylaws of the AIA expressly disclaim an agency relationship between the AIA and its components, plaintiffs assert that "[t]he AIA's complete involvement in the affairs and operations of its components belies any disclaimer of agency." *Id.* at ¶ 109. Finally, plaintiffs state that the AIA controlled the components' actions. Pls.' Opp. at 44.

Despite these conclusory assertions, the Court finds that the AIA did not make clear the LAA's authority to the plaintiffs, and the Court further concludes that any such reliance by the plaintiffs upon this alleged authority was unreasonable. The AIA and the LAA are separately incorporated entities; the LAA was incorporated in Louisiana, and the AIA, in New York. AIA Mem., Exh. 31, Perdue Aff. at ¶ 5. Although the LAA is referred to as a "component" of the AIA, each entity has its own independently selected officers and directors who manage their

respective affairs. *Id.* ¶ 6. There is no evidence that the AIA could or did exercise control over the business of the LAA as it related to architect selection on state projects. It is true that to be a component of the AIA, and to receive AIA recognition, the LAA, like the other 299 AIA components, is obligated to adhere to certain requirements. Specifically, the LAA exists under a charter granted by the AIA, the LAA must adopt bylaws consistent with those of the AIA, the LAA's bylaws and amendments must be submitted to the AIA for approval, the AIA may withdraw or suspend the LAA's charter, and the AIA establishes the LAA's jurisdiction for membership purposes. Amended Compl. ¶ 108. While these facts establish an affiliation between the two entities, they do not establish a relationship of implied agency with respect to the matters in issue. Indeed, a member who read the LAA's bylaws would have no reasonable basis to believe that an agency relationship existed here because the bylaws state specifically that the AIA and its components are not agents of each other unless specified in writing and that they have no interest in the property or debts of each other. *Id.* ¶ 108(ix).

Further, that every member of the LAA is also a member of the AIA, "and so identifies him or herself" does not bestow upon the LAA the power of apparent authority. Pls.' Opp. at 43. The Court finds that it is unreasonable for a member to believe that the LAA is an agent of the AIA simply because the membership lists are identical. Moreover, the Court also notes that plaintiffs have produced no evidence that the AIA ever held the LAA out as its agent with respect to the conduct at issue or that the LAA's challenged actions implemented or enforced any policy or bylaw of the AIA.

Plaintiffs point to the alleged promise by the AIA to investigate the conduct of the LAA and its Executive Director as a manifestation by the AIA of the LAA's authority. Such a promise may, at best, illustrate the AIA's supervisory role over its components; it does not demonstrate that the LAA engaged in the challenged conduct with the apparent authority to act for the AIA. The Court also notes that for the doctrine of implied authority to apply, "the third party must rely reasonably on the manifested authority of the agent." *Boulos,* 503 So.2d at 3. In this case, Mr. Ehlinger has made no allegation that he relied on the LAA's (*i.e.,* the agent's) authority to act for the AIA. Rather, his reliance was upon a statement made by the AIA (*i.e.,* the principal) concerning its own, not the LAA's authority. Further, Mr. Ehlinger acknowledges that he never thought the AIA was responsible for any contracts or agreements entered into by the LAA. AIA's Mem. Exh. 29, Dep. of Ladd P. Ehlinger at 504–05. Mr. Ehlinger thus fails to satisfy the test for implied agency.

█ Finally, the consent decree [5] relied on by plaintiffs is irrelevant to the apparent authority inquiry. The consent decree did not establish a legal relationship between the AIA and its components. Rather, it settled a lawsuit challenging the AIA's own policies regarding price competition, and it did not involve the conduct of a single, local component. Plaintiffs have not alleged that the LAA's allegedly anticompetitive behavior was undertaken pursuant to any AIA policy to which components were required to adhere. In short, the Court concludes that the consent decree has no bearing on the issues here.

The Court also notes that this case presents very different facts from those existing in *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), in which the Supreme Court held that a standard-setting association could be liable for the antitrust violations committed by its agents acting within their apparent authority. The agent in *Hydrolevel* who was accused of anticompetitive behavior was the vice-chairman of a subcommittee of the American Society of Mechanical Engineers ("ASME"). The agent used the Association's

---

5. Plaintiffs rely on a 1990 Consent Decrees between the AIA and the Justice Department settling an antitrust suit that challenged the AIA's policies regarding price competition. The decree enjoined the AIA and its components from adopting any course of action that discouraged price competition by architects.

safety standards against the plaintiff at the behest of a competitor. *Id.* at 572–74, 102 S.Ct. at 1945–46. The Supreme Court found that "[w]hen the [ASME] cloaks its subcommittee officials with the authority of its reputation, ASME permits those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace." *Id.* at 570–71; 102 S.Ct. at 1945. As a means of deterrence, the Court concluded that a rule imposing liability on the standard-setting organization for the antitrust violations of its agents acting with apparent authority would best serve the purposes of the antitrust private cause of action. *Id.* at 572–73, 102 S.Ct. at 1945–46.

Plaintiffs' theory of apparent authority is many steps removed from the situation presented in *Hydrolevel.* First, plaintiffs do not allege that the LAA was using the name, standards, policies or authority of the AIA to accomplish anticompetitive purposes. In *Hydrolevel,* on the other hand, the subcommittee drafted letters on the ASME's letterhead and directly represented that it was speaking for the ASME on the matter at issue. Further, the ASME had entrusted the interpretation of its standards to the subcommittee. Here, the LAA and the AIA are separately incorporated entities, managed and directed by separate officers and directors. The LAA did not hold itself out as acting for the AIA, and the LAA was not carrying out any AIA policy entrusted to it by engaging in the conduct at issue. The LAA's affiliation with the AIA simply does not fit the *Hydrolevel* pattern.

For all of the foregoing reasons, the Court grants the AIA's motion for summary judgment on the issues of its liability under agency theory.

## VII. *MR. EHLINGER'S DEFAMATION CLAIM*

Plaintiffs also allege that certain minutes of LASB meetings contain statements that defame Mr. Ehlinger by alleging that he falsified applications for projects to be awarded by the LASB. Defendants argue that the statements are "unspecified remarks by an unidentified person," were allegedly made in the context of a public body dutifully

investigating the applications filed by firms seeking government contracts, and that plaintiff has not shown that the statements are false. LAA's Mem. at 21–22.

In Louisiana, "defamation actions have been found inordinately susceptible to summary judgment." *Wright v. Dollar General Corp.,* 602 So.2d 772, 774 (La.App. 2d Cir.), *writ denied,* 606 So.2d 538 (La.1992). Because of the First Amendment considerations involved in a defamation action, a plaintiff bears an extremely heavy burden to withstand a motion for summary judgment, regardless of whether the defendant is a member of the news media. *Bell v. Rogers,* 698 So.2d 749, 753 (La.App. 2d Cir.1997); *Kosmitis v. Bailey,* 685 So.2d 1177, 1180 (La.App. 2d Cir.1996). Summary judgment motions on defamation claims test the evidentiary strength of the plaintiff's case to determine whether the plaintiff will likely be able to prove his factual assertions with convincing clarity at trial. *Sassone v. Elder,* 626 So.2d 345, 351–52 (La.1993); *Bell,* 698 So.2d at 753; *Wright,* 602 So.2d at 774.

Under Louisiana law, Mr. Ehlinger must show the following elements to maintain his defamation action: (1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury. *Cangelosi v. Schwegmann Bros. Giant Super Markets,* 390 So.2d 196, 198 (La.1980). The cause of action fails if just one of these elements is lacking. *Bell,* 698 So.2d at 753. Further, "[t]he question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is one for the court." *Sassone,* 626 So.2d at 352.

The following are the only allegations in plaintiffs complaint relevant to the defamation claim:

64. The [LASB] Minutes contain statements that defame Plaintiff Ehlinger and disparage his company.

65. The defamatory statements have no basis in fact.

66. The statements were made in bad faith and are not privileged.

67. Plaintiffs do not know if these defamatory remarks were published to an audience larger than the members of the Louisiana Architect Selection Board.

68. Plaintiffs first discovered the defamatory statements in a review of the Louisiana Architect Selection Board Minutes within the last several months.

69. A review of the Minutes suggests that the Minutes have been selectively altered or removed.

70. Plaintiffs are unable to state that the Minutes they recently reviewed are the Minutes that were originally taken or recorded.

. . . .

113. Louisiana Architect Selection Board Minutes contain statements defaming Plaintiff Ehlinger by alleging that he falsified applications for projects to be awarded by the Louisiana Architect Selection Board.

114. These statements impose liability on Defendants under Louisiana Civil Code Article 2315.

Amended Compl. ¶¶ 64–70, 113–14.

The alleged defamatory statements were made at meetings held on October 22, 1991, February 11, 1992, and June 1, 1992.[6] At the October 22, 1991 meeting, "[t]he decision was made that if any member of the Board felt they had reviewed falsified applications, these applications would be discussed by the Board and referred to the State Licensing Board for investigation and possible further action." LAA's Mem., Exh. 34, Minutes of Oct. 22, 1991, at 26. Ehlinger & Associates was one of four firms named as having submitted an application that was possibly falsified. The minutes noted that a Board member had questions about the number of employees listed on the application. *Id.* It was decided that the four firms' applications would be referred to the Louisiana State Board of Architect Examiners, the state licensing board: "The Board voted to look into each of these [applications], with [one Board member] to

write a letter to the Licensing Board requesting they look into correctness of the information and what appropriate actions should be taken." *Id.* at 27. On February 11, 1992, the Board continued to discuss the possible falsification of applications. It was explained that the licensing board informed the LASB that a specific form had to be submitted if the LASB wished to file a formal complaint. *Id.*, Exh. 35, Minutes of Feb. 11, 1992, at 3. Although it was noted that Ehlinger & Associates did not respond to the chairman's letter informing the firm of the LASB's inquiry, no action was taken at that time with respect to the possible falsification. *Id.* Finally, on June 1, 1992, the LASB decided to file a formal complaint with the Licensing Board for action against Ehlinger & Associates for the discrepancy in the application submitted and reviewed at the February 11, 1992 Board meeting. *Id.*, Exh. 36, Minutes of June 1, 1992, at 40.

As mentioned *supra*, "[w]hether a particular statement is objectively capable of having a defamatory meaning is a legal issue to be decided by the court, considering the statement as a whole, the context in which it was made, and the effect it is reasonably intended to produce in the mind of the average listener." *Kosmitis*, 685 So.2d at 1177. For the following reasons, the Court finds that the statements contained in the Board minutes are not defamatory. The Court first notes that plaintiff does not allege that any one particular statement is defamatory. Rather, plaintiff points to the minutes as a whole and alleges that the minutes—not actual statements made at the Board meeting—contain defamatory statements. The Court concludes that although the minutes inquire into the accuracy of an application submitted by Ehlinger & Associates, the minutes do not affirmatively state that the firm falsified an application. Despite plaintiff's assertions to the contrary, the minutes do not reflect a discussion in which LASB members accuse Mr. Ehlinger of lying. There is no indication that a Board member specifically stated that Mr. Ehlinger filed false documents. Rather, the minutes reflect a discussion by the Board

---

**6.** Because the defamation claim is disposed of on its merits, the Court pretermits the question of prescription.

791

of the accuracy of filings from a number of different architectural firms. The Court agrees with the LAA that the minutes simply reflect that the LASB looked into the accuracy of applications filed by firms seeking government projects. LAA's Mem. at 22. The minutes demonstrate that the LASB did not rush to judgment against any of the architectural firms, and, instead, after an initial inquiry, referred the matter to the state licensing board for a proper investigation. In short, the minutes do not defame Mr. Ehlinger; they simply illustrate the process by which the LASB looks into possible improprieties. Without an actual defamatory statement, plaintiff's claim for defamation fails.

For all of the foregoing reasons, defendants' motions for summary judgment on all of plaintiffs' claims are GRANTED.