ASTORIA ENTERTAINMENT, INC.

v.

Edwin W. EDWARDS, Edward J. Debartolo, Jr., Debartolo Entertainment Louisiana Gaming, Inc., Hollywood Casino Corporation, Stephen Edwards, Andrew Martin, Cecil Brown, Bobby Johnson, Gregory Tarver, Robert Guidry, Treasure Chest Casino, L.L.C., Boyd Kenner, Inc., Louisiana Gaming Enterprises, Inc., Robert List, Hollywood Park, Inc., Sam Gilliam, Floyd Landry, Gia Kosmitis, Dr. Lewis James, Veronica Henry, and Barton Conradi

No. CIV A 98–3359.

United States District Court,
E.D. Louisiana.

Aug. 22, 2001.

Henry L. Klein, Thomas J. Cortazzo, New Orleans, LA, for Plaintiff.

Lloyd Eades Hogue, New Orleans, LA, Aubrey B. Harwell, Jr., Nashville, TN,

Richard Terrell Simmons, Jr., Baton Rouge, LA, Karen Delcambre McCarthy, New Orleans, LA, Paul Slocomb West, Baton Rouge, LA, C. Lawrence Orlansky, New Orleans, LA, Joseph Nicholas Mole, New Orleans, LA, for Defendants.

## ORDER AND REASONS

DUVAL, District Judge.

Before the Court are Motions to Dismiss filed by the following defendants: (1) Edwin W. Edwards and Andrew Martin (rec. doc. 97); (2) Edward J. DeBartolo, Jr. (rec.doc. 83); (3) Stephen Edwards (rec. doc. 89); (4) Robert Guidry (rec.doc. 88); (5) Louisiana Gaming Enterprises, Inc. ("LGE") and Boomtown, Inc. (collectively referred to as "Boomtown")(rec.doc. 85); (6) Crown Group, Inc. ("Crown") (rec.doc. 87); and (7) Boyd Kenner, Inc., Boyd Gaming Corporation, Boyd Louisiana, L.L.C. ("Boyd") (rec.doc. 107) against plaintiff Astoria Entertainment, Inc. ("Astoria").[1] The motions were set for hearing on June 20, 2001 and the Court entertained oral argument on all motions on July 11, 2001. The Court has heard the arguments of counsel and has considered the pleadings, memoranda and relevant law and finds for the reasons that follow.

## I. Facts and Procedural Background

### A. General Background

This litigation arises out of the riverboat gaming licensing process. Accordingly, a brief overview of the relevant gaming laws is a necessary backdrop to analyze plaintiff's allegations.

In 1991, the Louisiana Legislature enacted the Louisiana Riverboat Economic Development and Gaming Control Act ("the Act"), codified at Louisiana Revised Statutes 4:501–562. The law became effective July 18, 1991.[2] The Act proscribed the licensing process for those seeking to operate riverboat gambling casinos. Section 525 of the Act limited the maximum number of licenses to fifteen, with 6 being the maximum number of licenses issued in any one parish.

Parts II and III of the Act created two separate and distinct bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities in furtherance of the Act's purposes.[3] See State Through Dept. of Public Safety and Corrections v. Louisiana Riverboat Gaming Commission and Horseshoe Entertainment, 94–1872 (La.5/22/95), 655 So.2d 292. Louisiana Revised Statutes 4:515 created the Gaming Enforcement Division, which was vested with regulatory and enforcement powers. The other body was referred to as the Riverboat Gaming Commission ("The Commission"). The Commission was "a rule and policy making body . . . appointed by the governor and confirmed by the

---

1. Except for Coregis Insurance Company, whose motion is set for a later date, these parties represent all served defendants. Players International, Inc., Metro Riverboat Associates, Inc., Hilton Hotel Corp., and Park Place Entertainment did not waive service of process under Federal Rule 4(d) and were not otherwise served.

2. By Act 7 of the First Extraordinary Session of 1996 the legislature enacted the Louisiana Gaming Control Law, La. R.S. 27:1, et seq. The portions of the prior law that were not

revoked can be found at La. R.S. 27:41 et seq. However, the Court utilizes the initial statutory designations.

3. This bicameral structure was revoked by Louisiana Gaming Control Law, La. R.S. 27:1, et seq. The Gaming Control Law created the Louisiana Gaming Control Board, which succeeded to the powers of both the Gaming Commission and Enforcement Division. However, the bicameral structure was still in place at all relevant times in this case.

Louisiana Senate." *Id.* Pursuant to La. R.S. 4:511 the Commission was to promulgate rules to provide for and determine riverboat routes, minimum levels of insurance to be maintained by licensees, specifications for design, appearance, accommodations and constructions of riverboats, and other qualifications. The Commission was also given oversight authority with the power to "hear and determine all appeals relative to the granting, suspension, revocation, condition, or renewal of all licenses, permits and applications." La. R.S. 4:511.

Under its rulemaking powers, the Commission required any prospective riverboat operator to apply to the Commission for a Certificate of Preliminary Approval ("CPA"). *See* La. Admin. Code 42:XIII.303.[4] The first eight Certificates of Preliminary Approval were awarded in March of 1993. The second round, where the remaining seven certificates were awarded and from which most of the allegations in this litigation arise, took place on June 18, 1993. *See* Indictment at p. 3.

Astoria filed its original complaint on November 12, 1998. The Original One Count Complaint was premised solely on the defendants' alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.1961 et seq., and sought civil damages under section 1964 of the statute. Named as RICO defendants in the original complaint were: Edwin Edwards, Edward DeBartolo, Jr., DeBartolo Entertainment Louisiana Gaming, Inc., Hollywood Casino Corp., Stephen Edwards, Andrew Martin, Cecil Brown, Bobby Johnson, Gregory Tarver, Robert Guidry, Treasure Chest Casino, L.L.C., Boyd Kenner,Inc., Louisiana Gaming Enterprises, Inc., Robert List, Hollywood Park, Inc., Sam Gilliam, Floyd Landry, Gia Kosmitis, Dr. Lewis James, Veronica Henry, and Barton Conradi.

On February 2, 1999, plaintiff voluntarily dismissed all defendants except Edwin Edwards, Edward DeBartolo, Stephen Edwards, Andrew Martin and Robert Guidry pursuant to Rule 41 of the Federal Rules of Civil Procedure (rec.doc. 29). On April 11, 1999, this matter was stayed pending the prosecution and conclusion of the criminal proceeding in the Middle District of Louisiana captioned *United States v. Edwin Edwards, et al.*, Cr. No. 98–165B (*see* rec. doc. 55). The stay was lifted on February 23, 2001 (rec.doc.65), soon after the criminal convictions were returned and sentences imposed.

Astoria filed an amended complaint on March 6, 2001 (rec.doc. 68). In addition to the original RICO cause of action, the amended complaint asserts violations of the Sherman and Clayton Antitrust Acts (Count IV) against Edwin Edwards, Robert Guidry, and all defendants who received CPA's on June 18, 1993, as well as several causes of action under Louisiana state law. In addition to the new causes of action, plaintiff named several new defendants, some of whom were previously dismissed, and limited the RICO allegations to Edwin Edwards, Andrew Martin, and Stephen Edwards. Added as defendants for non-RICO causes of action were Boyd Kenner, Inc., Boyd Gaming Corp., Boyd Louisiana, L.L.C., Crown Group, Inc., Louisiana Gaming Enterprises, Inc., Boomtown, Inc., Hollywood Park, Inc., Players International, Inc., Metro Riverboat Associates, Inc., Hilton Hotel

---

**4.** That rule and several others were struck down in *State Through Louisiana Riverboat Gaming Commission v. Louisiana State Police Riverboat Gaming Enforcement Division,* 694 So.2d 316 (1996). However, those rules are pertinent here in that they were in force at most, if not all, times relevant to Astoria's participation the riverboat gaming application process.

Corp., Park Place Entertainment Corp., and Coregis Insurance Company. The newly alleged state law claims are "Civil Conspiracy to Corrupt the Riverboat Gaming Licensing Process and to Eliminate Competition" (Count I), "Corruption of Riverboat Gaming Process" (Count II), "Violation of Louisiana Antitrust Laws" (Count V), "Violations of the Louisiana Unfair Trade Practices Act" (Count VI), and "Abuse of Privilege to Practice Law" (Count VII).

The focus of plaintiff's complaint is that it "would have received a Certificate of Preliminary Approval and ultimately a license in the absence of corruption." Amended Complaint at ¶ 6. Describing what it perceived to be the practical role of the Certificate of Preliminary Approval, plaintiff alleges that "[c]ompetitors for a license first needed to obtain a Certificate of Preliminary Approval before applying to the State Police and undergoing a "suitability" inquiry." Amended Complaint at ¶ 5. Astoria alleges that it did not receive a Certificate of Preliminary Approval ("CPA") at the June 18, 1993 Louisiana Gaming Commission meeting even though its officials were told the company was well qualified. According to plaintiff, the role of the CPA was critical as evidenced by the fact that "[i]n the awarding of the 15 licenses, no applicant for a license was considered in the absence of a Certificate of Preliminary Approval and all recipients of Certificates of Preliminary Approval received licenses." Amended Complaint at ¶ 5. It is Astoria's contention that "[i]n a competitive environment not affected by corruption and conspiratorial tampering, Astoria would have received a Certificate of Preliminary Approval and ultimately a license." Amended Complaint at ¶ 6. Asto-

ria's Amended Complaint details facts with respect to only two potential berths: Kenner, Louisiana and Gretna, Louisiana.

**The Kenner Berth**

The relevant events with respect to the Kenner berth are relatively few. *See* Amended Complaint at ¶ 7(a)-(j). Astoria initially entered the competition for a CPA for a riverboat to be named the "Cannes Burlee." At that time, the City of Kenner issued Requests for Proposals to potential riverboat operators seeking the Kenner berth. Astoria complied with the City's request and eventually received a letter of suitability from the City, while the eventual license recipient did not. According to the complaint, soon thereafter Robert Guidry began a pattern of making payments to politically connected persons. By March 30, 1993, Astoria's gaming operator, Argosy, decided to abandon the project based upon rumors that it heard "Bobby Guidry had the boat...locked up." Amended Complaint at ¶ 7 (i). Around the same time, Guidry directly told a principal of Astoria that he was guaranteed the license "by virtue of his close relationship with Edwin Edwards." Complaint at ¶ 31. Upon losing its gaming operator, Astoria immediately abandoned any effort to obtain a CPA for that location. From the face of the Complaint and Amended Complaint, it appears that Astoria terminated all activities in Kenner by the end of March 1993.[5] Astoria alleges that its failure to compete for the Kenner CPA was caused by the conspiracy. Because of Guidry's connection with Edwards, Astoria turned its sights to a Gretna berth.

**The Gretna Berth**

With respect to the Gretna Berth, Astoria's Complaint and Amended Complaint

---

5. Paragraph 7(h) of the Amended Complaint states that plaintiff's gaming operator "abandoned the project" on March 30, 1993. Paragraph 7(j) alleges that Astoria could no longer compete for a Kenner Riverboat after its gaming operator terminated their relationship.

focus upon plaintiff's failure to receive one of six Certificates of Preliminary Approval that were issued by the Gaming Commission on June 18, 1993. According to plaintiff, it complied with all requirements of the Louisiana Riverboat Economic Development and Gaming Control Act,—including performing a detailed feasibility study, a detailed statement of proposed operations, an economic development plan, and statements of local support—and would have received a CPA and a license but for defendants' nefarious activities. On April 6, 1993 Astoria filed an application for a CPA in favor of a riverboat named the "Gretna Belle." Complaint at ¶ 34. Although Astoria was assured support by the Mayor of Gretna, Lieutenant Governor Melinda Schwegmann, and at least four Gaming Commission members, it was not awarded a CPA at the June 18, 1993 Gaming Commission meeting. Prior to that meeting, in April 1993, Boomtown, Inc., a competitor, contracted with two of Edwin Edwards' close associates to assist in obtaining licenses. Amended Complaint ¶ 8(f-h). It is Astoria's contention that the lucrative lobbying agreements were merely payoffs or bribes in order to win the support of Governor Edwards, who would surreptitiously control the CPA selection process by manipulating the Gaming Commission. Also prior to the June 18 meeting, on June 9, 1993, Gaming Commission Chairman Pickering met with Edwards and gave him the list of candidates selected. As of June 10, 1993 that list included Astoria's boat, the Gretna Belle, but not the Boomtown Belle. Amended Complaint at ¶ 8(n). However, on June 16, 1993 Governor Edwards met with several local politicians to discuss their licensee preferences, ostensibly driven by political considerations. The Gretna Belle was not among the politicians' choices and on June 16, 1993, only two days before the Gaming Commission meeting, Edwin Edwards

called Gretna Mayor Ronnie Harris and told him that Astoria "is out." Amended Complaint at ¶ 8(s). Apparently, certain members of the Gaming Commission were unaware of this extracurricular activity and initially announced the Gretna Belle as the recipient of a CPA at the June 18, 1993 meeting. At that point, five of the seven commissioners introduced a substitute motion and introduced a new list that included the Boomtown Belle, but not the Gretna Belle. Amended Complaint at ¶ 8(v).

Following its rejection, in July 1993, a principal of the Gretna Belle met with Gilliam to discuss the unsuccessful application for a CPA. Gilliam confirmed that Astoria was entitled to receive a CPA but was unable to support that application because he was "threatened" and "in a political position" which required him to participate in the scheme of the enterprise as instructed by Senator Greg Tarver, a political ally of Edwin Edwards, and that his own best judgment was compromised as to which applicants receive CPA's. Original Complaint at ¶ 41. A principal of Astoria also met with Commissioner Landry. Landry told the principal that the Gretna Belle was unsuccessful because the principal "didn't get the man to turn the key," referring to Edwin Edwards. Original Complaint at ¶ 42.

Astoria claims that the conspiracy to corrupt the licensing process began in 1992 and continued at least until October 1998. Plaintiff alleges that a key feature of the conspiracy was the corruption of public officials which effectively allowed Edwin Edwards to dictate what applicants received licenses as opposed to the Gaming Commission. Amended Complaint at ¶ 16. A common characteristic of the conspiracy was to allow politicians closely aligned with Governor Edwards to name the recipients of riverboat licenses. Amended Complaint

at ¶ 16. A second feature of the scheme was the conspiracy of silence where certain defendants failed to disclose the existence of bogus consulting and lobbying agreements, extortion payments and other illegal activities. With that general background in mind, the Court turns to the allegations against the individual defendants.

## B. The Role of the Individual Defendants in the Alleged Conspiracy

### Edwin Edwards

Edwin Edwards, named a defendant in Counts I–VI, served his fourth and final term as Governor of Louisiana from 1992–1996. Thereafter, he shared a law office in Baton Rouge with his son Stephen. Plaintiff alleges that Edwin Edwards played a key role in the general corruption of the entire licensing process. RICO Standing Order at ¶ 2. Using his political and economic power and notoriety, Edwards drove the conspiracy to succeed in its purposes and objectives. In June 1993, Edwards met with the chairman of the Gaming Commission as well as several close political allies to discuss which riverboat applicants should be awarded CPA's. RICO Standing Order at ¶ 2; Amended Complaint at ¶¶ 8(r)-(v); Complaint at ¶¶ 36–37. Two days before the remaining CPA's were awarded, Edwards called the Mayor of Gretna to advise that his preferred candidate, Astoria, was not going to get a CPA, and that it would go to the Governor Edwards' friends instead. Complaint at ¶ 39. In other words, plaintiff contends that "Edwin Edwards...dictate[d] the boats that would receive the coveted Certificates of Preliminary approval..." Amended Complaint at ¶ 15. Once Edwards was out of office, he used his still considerable political influence to dominate the licensing authority and to extort Edward DeBartolo, the eventual winner of a previously issued but returned license.[6] Both during and after the time that Edwards held public office, plaintiff alleges that Edwards conspired with other individuals to corrupt the process through acts of bribery, extortion, mail fraud, and wire fraud. RICO Standing Order at p. 20.

### Andrew Martin

Andrew Martin is named as a defendant in Counts I, II, III and VI. Martin was a friend of Edwin Edwards and also held a position in the fourth Edwards administration. Plaintiff states that "Martin was a confidant to Edwin Edwards and solicited bribe and extortion payments on behalf of Edwin Edwards", Complaint at ¶ 9, and that he played a leading role at the center of the conspiracy to corrupt the licensing process. Amended Complaint at ¶ 24; RICO Standing Order at ¶ 6. Through the plaintiff's RICO case statement, defendant has incorporated by reference several paragraphs of the indictment of *United States v. Edwin Edwards et al.* detailing Martin's activities. Those allegations, all but one of which relate to events occurring after April 1994, generally relate to Martin's solicitation of payments from Robert Guidry in exchange for Martin's exertion of his political influence on the licensing process. *See* RICO Standing Order at ¶ 6.

### Stephen Edwards

Stephen Edwards is named a defendant in Counts I, II, III, VI, and VII and is alleged to have received attorneys' fees and other payments from several successful and unsuccessful riverboat applicants. Complaint at ¶ 8. Plaintiff alleges that riverboat applicants hired friends and family of Stephen Edwards and paid those friends and family fees far in excess of the value of services rendered in order to get

---

**6.** This license is often referred to as the "15th license."

favorable treatment upon, or at least to prevent Stephen Edwards from interfering with, their applications. *See, e.g.*, Amended Complaint at ¶¶ 18(b)(d); 23(a); 31(c)(d)(e); Indictment at pp. 13–24. These associates of Stephen Edwards would subsequently forward parts of their fees to Stephen Edwards. *See, e.g.*, Indictment at pp. 43–45. Moreover, Stephen Edwards himself collected legal fees in such a way that he violated his duty as an attorney. Amended Complaint at ¶¶ 18(e); 31(*o*); 32(g); Indictment at pp. 35, 44.

### Robert Guidry

Robert Guidry is named a defendant under all state and federal counts except for the RICO Count and the Abuse of Privilege to Practice Law Count. Plaintiff alleges that Guidry was a close friend of Edwin Edwards and the majority owner of the Treasure Chest Riverboat Casino. Complaint at ¶ 13. Astoria alleges that it withdrew from competition for a CPA for a Kenner berth because it was told that Guidry was guaranteed a license based on his relationship with Edwin Edwards. Complaint at ¶ 31. The Treasure Chest received a CPA on June 18, 1993 and ultimately received a license on May 17, 1994. *See* Indictment at p. 7. Plaintiff alleges that the Treasure Chest should not have received a CPA in 1993 because it failed to respond to local requirements imposed by the City of Kenner. *See* Amended Complaint at ¶¶ 7(a)-(c). Although Astoria alleges that Guidry was a close friend of Edwin Edwards, it also alleges that he made "payments to politically connected persons [such as Stephen Edwards] which were disproportionate . . . to the value of services rendered." Amended Complaint at ¶ 7(d). These payments were made beginning in February 1993 and caused Astoria to withdraw from competition for the Kenner CPA and license in March 1993.

### Edward DeBartolo

Defendant DeBartolo is named a defendant in Counts I, II, and VI, all of which allege violations of Louisiana law. According to the complaints, sometime after Astoria's failure to receive a CPA on June 18, 1993, a license previously awarded to American Entertainment[7] was abandoned. *See* Amended Complaint at ¶ 35. Accordingly, this license was returned to the competitive bidding process. Defendant DeBartolo together with the Hollywood Casino Corporation were awarded that gaming license on March 13, 1997. Prior to winning the license, in an attempt to placate Edwards, the DeBartolo–Hollywood Casino Corporation joint venture hired Wanda Edwards and Julie Fusilier as lobbyists to assist in the licensing process. *See* Amended Complaint at 35(j). Plaintiff alleges that, at that time, former Governor Edwin Edwards extorted $400,000 from DeBartolo, telling DeBartolo that unless the money was paid there would be problems with his pending license application. *See* Complaint at ¶¶ 46–47; Amended Complaint at ¶ 35(*o*). Subsequently, DeBartolo paid the money to Edwards in cash and the Gaming Board awarded the license to DeBartolo. *See* Complaint at ¶¶ 49–50; ¶¶ 35(p)-(q). Plaintiff alleges that DeBartolo's failure to report the shakedown attempts and payments and silence with respect to other activities by the conspiracy perpetuated the conspiracy and corrupted the licensing process. *See* Amended Complaint at ¶ 36. Astoria does not allege its role, if any, as to the competition for the license eventually awarded to DeBartolo.

---

**7.** American Entertainment received a CPA at the June 18, 1993 Commission meeting and was awarded a license prior to May 1994.

The Court now turns to the allegations against the corporate defendants.

## C. The Role of the Corporate Defendants in the Alleged Conspiracy

### Boyd Kenner, Inc., Boyd Gaming Corporation, and Boyd Louisiana, L.L.C.

Boyd Kenner, Inc., Boyd Gaming Corporation, and Boyd Louisiana, L.L.C. are named in Counts I, II, IV, V, and VI. The Boyd Entities were interrelated business organizations that own, and at one point operated, the Treasure Chest Casino. Like the defendants, the Boyd entities are alleged to have perpetuated the conspiracy through silence. Other than the inchoate acts, plaintiff pleads that Boyd should be vicariously liable for the acts of its agent, Robert Guidry. Further, plaintiff claims that Boyd failed to monitor the corporate books, which would have revealed the lucrative consulting agreements entered into between the Treasure Chest Casino and close associates of Edwin Edwards. *See* Amended Complaint at ¶¶ 26(b)-(e).

### Boomtown

The Boomtown entities are named as defendants in all Counts save Counts III and VII. Astoria alleges that, prior to the Commission's issuance of CPA's, Boomtown hired lobbyists to assist in the licensing process. Those lobbyists were closely connected to Edwin Edwards and were paid fees disproportionate to the alleged services rendered. *See* Amended Complaint at ¶¶ 8(g)-(h); ¶ 18(a); ¶ 19; ¶¶ 29(b)-(c), ¶¶ 30(b)-(c). According to plaintiff, the Boomtown casino was on Edwin Edwards' list of boats with corrupt connections that were to receive a CPA. *Id.* at ¶ 8(t). Along with the hired lobbyists, Boomtown's Vice–President attended a crawfish boil at the Governor's mansion on April 28, 1993 and soon thereafter began boasting that Boomtown would win a Certificate of Preliminary Approval.

Amended Complaint at ¶ 29(e), (g); ¶ 30(f), (h); Complaint at ¶¶ 37–38, 44. And although Boomtown did receive a CPA and a license, it did not berth where it initially indicated on its early applications. Amended Complaint at ¶ 21. Moreover, Astoria alleges that Boomtown's April 28, 1993 CPA presentation to the Gaming Commission and its application for a CPA were deficient and not as good as Astoria's. Amended Complaint at ¶¶ 30(d)-(e). Finally, Boomtown received a CPA on June 18, 1993. Overall, plaintiff alleges that "[i]n obtaining a Certificate of Preliminary Approval to berth a riverboat in the Harvey Canal without prerequisite support and through politically-corrupt influence and tampering, LGE and Boomtown participated in the conspiracy..." Amended Complaint at ¶ 30.

### Crown Group, Inc.

Crown Group, Inc. is named in Counts I, II, IV, V, and VI. Crown is the successor to St. Charles Gaming Company, Inc., which obtained a CPA for the "Belle of St. Charles" casino. Thus, Astoria's allegations against Crown are largely derivative for the actions of its predecessor. According to Astoria, St. Charles filed an abysmally deficient application for a CPA on March 19, 1993. Amended Complaint at ¶ 27(a). Soon thereafter, on March 25, 1993, a company called Skylink America, Inc. began hiring people with ties to Stephen Edwards as consultants to assist Skylink's entry into the riverboat gambling market. *See* Amended Complaint at ¶¶ 27(f), (g), (o), (r), (s)(u). On June 11, 1993, Sklylink executed a stock purchase agreement with St. Charles Gaming. Despite the lackluster application and local constituent and government opposition to the corporate merger, the Belle of St. Charles was granted a CPA on June 18, 1993 and a license on March 29, 1994. Unable to find an adequate berthing site,

Crown withdrew from the Louisiana market on August 21, 1997. Amended Complaint at ¶¶ 27(w-z), (bb). Overall, plaintiff argues that Crown did not follow licensing guidelines, participated in a "conspiracy of silence", hired close associates of Stephen Edwards, and conspired to illegally transfer the CPA through a corporate sale. *See* Amended Complaint at ¶¶ 28(a)-(m).

With these thoughts in mind, the Court will now consider the contentions of the respective parties. Since the several defendants urge dismissal on substantially similar grounds, the Court shall group the defendants according to the cause of action asserted, and present a unified version of their arguments.

### D. Contentions of the Defendants

#### 1. Federal Causes of Action

As to the RICO claim, Count III, the charged defendants, Edwin Edwards, Andrew Martin, and Stephen Edwards, put forth three primary reasons why Astoria's claim should be dismissed: (1) the claim has prescribed; (2) Astoria cannot allege a Rico claim because it has suffered no injury to its business or property and; (3) defendants did not proximately cause plaintiff's injury. Stephen Edwards' motion also argues that offensive collateral estoppel is not applicable in this case and that the criminal convictions do not operate to estop a defense in this action.

The Count IV federal antitrust defendants, Edwin Edwards, Robert Guidry, Louisiana Gaming, Inc. and Boomtown, Crown Group, Inc. and Boyd Kenner, Inc., Boyd Gaming Corp., and Boyd Louisiana, L.L.C. also make three main arguments in support of dismissal: (1) prescription; (2) antitrust immunity under the *Parker* and *Noerr–Pennington* doctrines and; (3) lack of antitrust standing. The defendants make essentially the same arguments with respect to the state antitrust claim in Count V.

#### 2. The State Law Causes of Action

As to Counts I and II, the "Civil Conspiracy to Corrupt the Riverboat Gaming Licensing Process" and "Corruption of the Riverboat Gaming Process", which include all defendants except Coregis, the defendants make three main arguments. First, they contend that Louisiana state law does not recognize either cause of action asserted. *Louisiana v. McIlhenny*, 201 La. 78, 9 So.2d 467 (1942) (civil conspiracy); *Jefferson v. Lead Industries*, 930 F.Supp. 241 (E.D.La.1996), *aff'd* 106 F.3d 1245 (5th Cir.1997)(civil conspiracy); *Campbell v. City of San Antonio*, 43 F.3d 973 (5th Cir.1995); *Chevalier v. L.H. Bossier*, 95–2075 (La.7/2/96) 676 So.2d 1072 (corruption). They argue that without allegations of an underlying tort under Louisiana Civil Code article 2315 or 2324, causation, concrete damages, or even an agreement, the civil conspiracy and general corruption claims must fall. Additionally, they argue that even were plaintiff to sufficiently allege a cause of action for civil conspiracy or corruption of the licensing process, that they would be governed by the residual one year prescriptive period that applies to all tort actions under Louisiana law, and that plaintiff's complaint, first filed in 1998, is prescribed.

As to the LUTPA claim in Count VI, defendants argue that plaintiff fails to allege a cause of action and that, in any event, the claim has prescribed. And as to Count VII, Stephen Edwards, through his insurer Coregis Insurance Co., argues that there is no private right of action for "abuse of privilege to practice law" and that the only recourse for the alleged actions lies in the attorney disciplinary process.

With this background in mind, the Court examines the relevant legal standards.

## II. Standard for Motion to Dismiss

Motions to dismiss are to be viewed with disfavor and rarely granted. *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982). In deciding such a motion, the district court must limit itself to the contents of the pleadings, including attachments thereto. Fed.R.Civ.P. 12(b)(6). "A motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts.'" *Crowe v. Henry,* 43 F.3d 198, 203 (5th Cir.1995)(*quoting Ward v. Hudnell,* 366 F.2d 247, 249 (5th Cir.1966)). "The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Shipp v. McMahon,* 234 F.3d 907, 911 (5th Cir. 2000). As such, "[t]he district court may not dismiss a complaint under rule 12(b)(6) 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). That being said, it is well established that courts do not have to accept every allegation in the complaint as true in considering its sufficiency. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir.1994). Courts do not have to accept "legal conclusions," "unsupported conclusions," "unwarranted references," or "sweeping legal conclusions cast in the form of factual allegations." *Id.;* Wright & Miller, *Federal Practice & Procedure* § 1357, at 315–18.

## III. Analysis

While plaintiff has raised numerous causes of action, the Court will focus on the federal issues first as the viability of those causes of action necessarily implicates this Court's subject matter jurisdiction.

### A. The Antitrust Claim

### 1. Statute of Limitations

■ Section 4B of the Clayton Act provides that "any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action has accrued." 15 U.S.C. § 15(b). Each defendant argues that plaintiff's cause of action accrued on June 18, 1993 and therefore had to be brought prior to June 18, 1997 in order to meet the statute of limitations. The original complaint, silent as to antitrust violations, was filed on November 12, 1998 and the amended complaint, including antitrust allegations, was filed on March 6, 2001. Therefore, defendants argue the matter is time barred.

According to plaintiff, the statute of limitations does not begin to run until plaintiff discovers his injury, a fact intensive requirement that cannot be decided by a motion to dismiss. It is Astoria's position that it was not injured until *all* licenses and CPA's were awarded, which plaintiff alleges did not occur until the fifteenth license was re-awarded on March 13, 1997. It claims that it remained a viable applicant until that time. In other words, Astoria claims that it was not injured when it was denied a CPA in 1993, which effectively made it impossible to obtain a license, or when all licenses were awarded to other applicants by May 1994.

■ Because the four year bar is undisputed, the relevant issue is when the antitrust cause of action accrues and triggers

the running of the statute. In the seminal case on the subject, the Supreme Court held that "[g]enerally a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971); *Bell v. Dow Chemical Co.*, 847 F.2d 1179 (5th Cir.1988). Furthermore, "[i]n a conspiracy action [accrual begins] with an overt act done in furtherance of the conspiracy." *State of Texas v. Allan Construction Company, Inc.*, 851 F.2d 1526, 1528 (5th Cir.1988)(*citing Zenith*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77). However, "[t]he fact that the act may inflict damages in the future, as opposed to at the time the acts are committed, does not prevent the cause of action from accruing." Julian O. van Kalinowski, Peter Sullivan & Maureen McGuirl, 8 ANTITRUST LAWS AND TRADE REGULATION, § 162.02[1] at p. 162–5 (citations omitted). That said, there are exceptions to the normal rules of accrual. In *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir.1982) Judge Tate stated that two grounds exist for allowing an antitrust suit to be brought more than four years after the events that initially created a cause of action.

 The first exception, called the "continuing conspiracy" or "continuing violation" exception, permits a cause of action to accrue whenever the defendant acts in furtherance of the conspiracy or commits an act that by its nature is a continuing antitrust violation. *Id.* (*citing Zenith*, 401 U.S. at 338–40, 91 S.Ct. 795). The Supreme Court has stated this first exception "has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover damages caused by that act..." *Zenith*, 401 U.S. at 338, 91 S.Ct. at 806. In other words, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date" a cause of action accrues for damages sustained on that date and those provable in the future. *See also Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir.1987) (a continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action accrues each time the plaintiff is injured); *Drumm v. Sizeler Realty Co.*, 647 F.Supp. 1288 (E.D.La.1986) (a violation is continuing only if plaintiff's interests are continually invaded). The key to this exception is that plaintiff itself, not some other third party, be injured by the continuing conspiratorial conduct.

 The second exception occurs when an antitrust act is revived outside the limitations period because damages were speculative when the act originally occurred. *Kaiser*, 677 F.2d at 1051. In addition, the courts recognize the equitable doctrine of fraudulent concealment as tolling the statute of limitations. However, a plaintiff "may invoke the fraudulent concealment doctrine only by proving two elements: first, that the defendants concealed the conduct complained of, and second, that the plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *State of Texas v. Allan Construction Company, Inc.*, 851 F.2d 1526, 1528 (5th Cir.1988).

 In the context of a Rule 12 motion, the Court looks to plaintiff's allegations to determine when the business injury occurred. Plaintiff's Complaint and Amended Complaint expressly and by reference to the criminal indictment in *U.S. v. Edwin Edwards, et al.* cite numerous illicit activities. However, in this civil matter plaintiff is not entitled to recover damages for all wrongs committed against society, for that

is a function reserved to the criminal law. Plaintiff may only recover for its own injuries. The issue before the Court then, is whether plaintiff was injured when it was denied a CPA on June 18, 1993, or whether it was injured when a previously returned license was finally re-issued in March 1997. Defendants' actions with respect to parties other than Astoria are irrelevant to this determination.

Plaintiff's federal antitrust count is "brought against Edwin Edwards, Robert Guidry, and *all defendants which received a Certificate of Preliminary Approval at the June 18, 1993 meeting* of the Riverboat Gaming Commission..." Amended Complaint at ¶ 44 (emphasis added). Two days earlier, on June 16, 1993, plaintiff alleges that Edwin Edwards and the other co-conspirators finalized the horizontal allocation of the riverboat licenses. Amended Complaint at ¶ 47. Astoria claims that it was injured "in its property in that it was denied a CPA/license..." RICO Standing Order at p. 19. The denial of the CPA had such an effect that Astoria was "deprived of its lawful right to compete for a license to operate a riverboat gaming vessel." RICO Standing Order at p. 42. It was unable to compete for the license because, "[c]ompetitors for a license first needed to obtain a Certificate of Preliminary Approval before applying to the State Police and undergoing a 'suitability' inquiry." Amended Complaint at ¶ 5. In the absence of corruption, Astoria claims that it "would have received a Certificate of Preliminary Approval and ultimately a license..." Amended Complaint at ¶ 6. And to the extent that it was denied the right to compete for a license, it appears that the alleged scope of its injury was limited to

its failure to prevail over the Treasure Chest and Boomtown. See RICO Standing Order at p.43 ("[Astoria] was deprived of making revenues that have been made by the Treasure Chest Casino or the revenues that have been made by the Boomtown Casino..."). However, the Treasure Chest claim is tenuous at best as Astoria did not submit a CPA for a Kenner berth.

From the face of plaintiff's complaints, it is clear that the injury to Astoria's interests took place in June 1993 when it did not win a CPA. Astoria's complaints are replete with facts demonstrating its vigilance in attempting to comply with the applicable law and win a Certificate of Preliminary Approval for a Gretna berth. When Astoria was not awarded a CPA for a Gretna berth, under the then existing system, Astoria was precluded from obtaining a license.[8] See, e.g., La. Admin Code 42:XIII.303 ("before commencing construction of any vessel...each person seeking approval of riverboat plans *shall submit* ...an application for a certificate of preliminary approval...")(emphasis added). Astoria admits as much in its pleadings and reiterated so at oral argument. See, e.g., Amended Complaint at ¶ 5; ¶ 6; RICO Standing Order at p. 42. Indeed, by the end of July 1993, Astoria was told by two different Gaming Commission members that its efforts failed for political reasons. Astoria's complaints do not allege that it administratively appealed the Commission's decision, informed the Gaming Division that trouble was afoot, or otherwise took any action. Filing a license application without a berth or sailing route was simply insufficient to obtain a license. Astoria was no longer viable as an appli-

---

**8.** It should be noted that in *State Through Louisiana Riverboat Gaming Commission v. Louisiana State Police Riverboat Gaming Enforcement Division*, 694 So.2d 316 (1996), the Louisiana First Circuit Court of Appeal struck down the CPA requirement finding that it essentially gave the Commission licensing power over the intended licensing body, the State Police. However, the CPA requirement was in force at all times relevant to this case.

**318**

cant after the June 18, 1993 Commission meeting. *See, e.g.,* La. Admin Code 42:XIII:707 (gaming may only be conducted when the riverboat is on a route authorized by the commission). As such, Astoria was completely eliminated from license competition by virtue of the adverse CPA decision.

Astoria's argument that the mere filing of a license application continues the limitations period through the time the 15th license was re-awarded in 1997 is not persuasive and profoundly hollow. First, Astoria attempted to argue at the hearing of these motions that the license application it submitted was a generic application that could have applied to any of the extant licenses. However, this argument contradicts the allegations in Astoria's complaint which detail its efforts to secure licenses for specific locations. *See, e.g.,* La. Admin Code 42:XII.2113, 2123 (license application requires proposed route, proposed dock facilities, land acquisition and site preparation costs, all of which are necessarily site specific); Amended Complaint at ¶ 7(j) ("Astoria could no longer compete for a Kenner riverboat..."); ¶ 8 (Astoria sought a riverboat named a Gretna Belle to be berthed at the Gretna Ferry Landing); RICO standing order at p. 21 (Astoria's preparatory work "laid the foundation" for applying for licenses in Kenner and Gretna). Astoria admitted at oral argument that it took no step to update or otherwise adapt its license application to provide for an alternate location once it became apparent that it would be unable to implement its plans for the Gretna Belle.

Furthermore, based upon the representations of counsel during oral argument, it is undisputed that the statutory maximum 15 riverboat licenses were all issued by May 1994, more than 4 years prior to the filing of this complaint. Indeed, it is disingenuous for Astoria to argue that it remained a candidate for a license after the *maximum number of licenses permitted by law* had been issued. Astoria's argument that its unrejected application remained extant for several years until the 15th license was returned and re-issued is facile. The reasoning behind such an argument would lead to absurd results in that it would permit all applications to remain pending indefinitely after all licenses were issued. Moreover, Astoria makes no allegation that it took any action to advocate its license application at that time. Astoria cannot point to a single concrete allegation that demonstrates an effort to obtain a license after it was denied a CPA.

As stated earlier, to the extent it lays out its own activities, Astoria alleges thorough preparation of a CPA for the Gretna berth. It does not plead its efforts to obtain a license, or for that matter discuss how it could have obtained or used a gaming license without approval of the Commission. Therefore, even were the CPA denial not Astoria's final injury, the latest its injury could be triggered is May 1994 when all of the licenses were issued, and it did not have one. Astoria simply did not act after its injury. It did not pursue potential administrative remedies, did not take special action to obtain a license, and did not timely seek redress in the courts. Astoria cannot simply sit idly on its rights without consequence.

As plaintiff has not brought suit within four years of its injury, it must rely on an exception to the normal rules of accrual in order to maintain its cause of action. The first exception, the continuing conspiracy exception, does not apply here. The continuing conspiracy doctrine requires that a plaintiff's interests be continually invaded or injured. In this case, as plaintiff itself pleads, the "final decision to

horizontally allocate licenses" was made at a meeting held at 11:00 a.m. on June 16, 1993. Amended Complaint at ¶ 47. And as discussed above, the injury occurred soon thereafter. Astoria's injury in not receiving a CPA was a complete deathblow to its hopes of carrying out a riverboat gaming enterprise. It only made one bona fide effort to obtain a CPA, for a Gretna berth. In essence it put all its eggs in one basket. As stated by the Fifth Circuit in *Poster Exchange, Inc. v. National Screen Service Corporation, et al.,* 517 F.2d 117 (5th Cir.1975), "[w]here the violation is final at its impact, for example, where a plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act." *Id.* at 126–27. To the extent that the defendants committed illegal acts after that time, those actions were irrelevant to Astoria as it no longer had a legitimate stake in the riverboat gaming business, and there was no continuing injury to its interests. *See Love v. National Medical Enterprises et al.,* 230 F.3d 765, 772–73 (5th Cir.2000) (continuing conspiracy doctrine requires continuing antitrust violations that *cause injury to the plaintiff*); *See, e.g., Little Caesar Enterprises, Inc. v. Smith,* 895 F.Supp. 884 (E.D.Mich.1995) (plaintiff barred under statute when it fails to allege antitrust violations affecting its own interests within the limitations period). Whatever damages it may have suffered in not getting a CPA and license are "merely the abatable but unabated inertial consequences of . . . pre-limitations action[ ]", and do not satisfy the continuing conspiracy exception. *Poster Exchange,* 517 F.2d at 128; *See also United Farmers Agents Association, Inc. v. Farmers Insurance Exchange,* 892 F.Supp. 890 (W.D.Tex.1995)

(*citing Al George, Inc. v. Envirotech Corp.,* 939 F.2d 1271 (5th Cir.1991)) (continuing conduct which merely furthers initial antitrust violation does not prevent the running of the statute); *Sizeler Realty Co., Inc.,* 647 F.Supp. at 1291 (no new accrual when adherence to a single business decision causes antitrust injury); *See generally, Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods,* 824 F.2d 582 (8th Cir.1987).

 As to the second exception, the Court does not find that the damages sustained by Astoria were so speculative that the limitations period should have been tolled. Astoria has never claimed that the damages sustained were speculative. In fact, it has consistently maintained that its damages could be measured according to the performance of the riverboats that did receive CPA's and licenses. To the extent any expected performance is speculative, Astoria could have plead its damages as accurately in 1994 as it did in 1996 or 2001. Finally, the doctrine of fraudulent concealment does not apply to toll the statute as plaintiff neither sufficiently pleads that "the defendants concealed the conduct complained of . . . [or] . . . that the [Astoria] failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *State of Texas v. Allan Construction Company, Inc.,* 851 F.2d 1526, 1528 (5th Cir.1988). As to concealment, the CPA process was open to the public, and plaintiff specifically pleads that certain defendants hired lobbyists with connections to Edwin Edwards, which was also common knowledge. *See* Amended Complaint at ¶ 7(g)(h); ¶ 18(a). According to the plaintiff, the corruption was so apparent that the licensing process had "no pretense of legitimacy." Amended Complaint at ¶ 21. Moreover, plaintiff's several allegations that participants such as Robert Guidry and Robert List boasted

of their involvement in the illicit activity, combined with the Gaming Commissioners' inculpatory statements portrays an overt scheme as opposed to a covert scheme. As to plaintiff's diligence in attempting to discover the facts that formed the basis for its claim, the Court, for the reasons explained above with respect to the injury discovery rule, finds that plaintiff did not act diligently. *See Klehr v. A.O. Smith Corporation,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (fraudulent concealment doctrine is not only concerned with the defendants behavior and presupposes diligent action by the plaintiff).

Astoria's cause of action accrued on June 18, 1993 at the earliest, and by May 1994 at the latest, both more than four years before suit was filed. Therefore, Astoria's antitrust cause of action is time—barred and must be dismissed.

## 2. *Parker* and *Noerr–Pennington* Immunity

■ All antitrust defendants rely on antitrust immunity in support of their respective motions to dismiss. Governor Edwards' motion is based upon the *Parker* state action immunity doctrine while the remainder of the defendants plead antitrust immunity under what is known as the *Noerr–Pennington* doctrine.

Edwards argues that, regardless of the criminal activity alleged, the rules of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) immunize him from Sherman and Clayton Act liability. All antitrust defendants except Edwin Edwards argue that dismissal is appropriate by force of the *Noerr–Pennington* doctrine.

■ The *Parker* doctrine, based on considerations of federalism and state sovereignty, shields from antitrust liability those persons acting in their capacities as sovereigns. The Court in *Parker* held that the Sherman Act does not reach anticompetitive effects produced by official state action. There, the Court, assuming that the regulatory program before it would violate the antitrust laws if established by agreement among private parties validated the states' actions implementing regulatory program because:

> [i]t derived its authority and efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.

*Id.* at 350–51, 63 S.Ct. at 313.

■ The *Noerr–Pennington* corollary to the *Parker* doctrine instructs that "the federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *Omni* 499 U.S. at 379–80, 111 S.Ct. at 1353–54 That doctrine, distilled from two Supreme Court cases, and based upon political and constitutional concerns, instructs that the Sherman and Clayton Acts do not reach political activities, no matter how nefarious those activities may be. Whereas the *Parker* doctrine applies to state action, *Noerr–Pennington* applies to private parties seeking government action. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court relied upon basic statutory construction and constitutional theory to find that the Sherman Act cannot be predicated upon attempts to influence the passage of enforcement of laws. *Id.* at 136, 81 S.Ct. at 528. The Court held that "the Sherman Act does not

prohibit two or more persons from associating together in an attempt to persuade the legislature or executive to take particular action with respect to a law that would produce a restraint or monopoly." *Id.* at 136, 81 S.Ct. at 529. In *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), a case involving attempts to influence the Secretary of Labor to set a higher minimum wage, the Court extended *Noerr*, stating that, "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purposes." *Id.* at 670, 85 S.Ct. 1585, 85 S.Ct. at 1593. *Pennington*'s significance lies in the fact that it entailed more than the general lobbying activity seen in *Noerr*, but immunized lobbying directly to executive officials with commercial functions.

In *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) the Court emphasized the broad nature of the *Parker* doctrine, holding that no "conspiracy exception" could overcome state immunity. The Court reasoned that:

> The rationale of *Parker* was that, in light of our national commitment to federalism, the general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators.

*Id.* at 374, 111 S.Ct. 1344; 111 S.Ct. at 1351. The Court emphasized the strength of those principles when considering whether a limited conspiracy exception, only applicable to illegal conduct, such as bribery, is warranted. The Court stated as follows:

> Another approach is possible, which has the virtue of practicality but the vice of being unrelated to the purposes [of the Sherman Act]. That is the approach

which would consider Parker inapplicable only if, in connection with the governmental action in question, bribery or some other violation of state or federal law has been established. Such unlawful activity has no necessary relationship to whether the governmental action is in the public interest...[W]e reaffirm our rejection of any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on perceived conspiracies to restrain trade...

*Id.* at 378–79, 111 S.Ct. at 1353 (internal citations and quotations omitted). Such is *Parker*'s strength that "any action that qualifies as state action is ipso facto... exempt from operation of the antitrust laws." *Id.* at 379, 111 S.Ct. at 1353.

▪ As with *Parker*, *Noerr–Pennington*'s reach also was magnified by *Omni* in that the Court held no conspiracy exception existed for *Noerr–Pennington* either, even one limited to situations involving "some element of unlawfulness." *Omni* at 499 U.S. at 383, 111 S.Ct. at 1356. By stating that there is no conspiracy exception to the *Noerr–Pennington* doctrine, the Supreme Court overruled those prior cases, such as *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), which stated that corrupt practices in connection with lobbying activities stripped an actor's immunity. Indeed, the Court definitively stated that "[g]iving full consideration to this matter for the first time, we conclude that a "conspiracy exception" to *Noerr* must be rejected." *Id.* at 383, 111 S.Ct. at 1355. Overall, *Parker* and *Noerr–Pennington* are two sides of the same coin, standing for the proposition that any type of conspiracy exception would have "nothing to do with the policies of the antitrust laws." *Id.* at 383, 111 S.Ct. at 1356.

■ The result of these cases is that, as a general rule, lobbying and other efforts to obtain legislative, executive, judicial and quasi-judicial actions do not violate the antitrust laws. *See Acoustic Systems v. Wenger Corp.*, 207 F.3d 287 (5th Cir.2000); *See also Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 862 (5th Cir. 2000) (citations omitted). Defendants seize upon this line of cases and argue that *Parker* and *Noerr–Pennington* require dismissal of plaintiff's antitrust claims. Regardless of plaintiff's allegations of corrupt and criminal activity, defendants respond that the jurisprudence holds that anticompetitive activity on the part of government officials is addressed by a host of other law, but not the antitrust law. Defendants claim that even taking plaintiff's allegations as true and for purposes of this motion finding that the defendants engaged in corrupt political lobbying that *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Omni*, 499 U.S. at 380, 111 S.Ct. at 1354 (*citing Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)).

Plaintiff's initial response is that the facts of this matter are outside the scope of antitrust immunity doctrine. Citing several pre-*Omni* cases, plaintiff responds that the First Amendment right to petition the government provides no safe harbor for corruption and that *Noerr–Pennington* is limited to providing protection for those seeking the passage or enforcement of laws. Additionally, plaintiff states that under *Allied Tube* private activity is not protected under *Noerr–Pennington*. For example, plaintiff reasons that the alleged meetings between the various defendants were held in private at the Governor's mansion and not in a public atmosphere and therefore are not outside the scope of the antitrust laws. Finally, plaintiff claims that *Omni, Ehlinger & Associates v. Louisiana Architects Assoc.*, 989 F.Supp. 775, 780–84 (E.D.La.1998), *aff'd* 167 F.3d 537 (5th Cir.), and *Bayou Fleet* all involve activities integral to the lawmaking or adjudicatory process whereas this case involves activity completely extraneous to the lawmaking process. As such, plaintiff argues that *Omni* doesn't swallow all antitrust cases, especially those where the lobbying and corrupt activities are not totally integrated with legitimate governmental process.

■ *"Parker* and *Noerr* are complimentary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects state acts of governing, and the latter the citizens participation in government." *Omni*, 499 U.S. at 383, 111 S.Ct. at 1355. The Court finds that the *Noerr–Pennington* and *Parker* arguments have merit.

To start, plaintiff's recital that the alleged bribery, extortion and corruption abrogate antitrust immunity is simply an attempt to end-run the *Omni* decision, which clearly holds that illegal actions do not remove a case from the ambit of *Parker* or *Noerr–Pennington*. Along those same lines, plaintiff misconstrues the basis for those immunities in arguing that actions not guaranteed by the First Amendment receive no antitrust protection. Although freedom to petition is a basis for antitrust immunity, it is not the only basis. An equally important justification for *Parker* and *Noerr–Pennington* is that the Sherman and Clayton Acts were intended to regulate business, not politics. *See Bayou Fleet v. Alexander*, 234 F.3d 852, 859 n. 7 (*Noerr–Pennington* is "inextricably associated with interpretations of the Sherman Act"). As stated by the *Omni* Court, "[t]o use unlawful political influence as the test of legality of state regulation undoubtedly

vindicates (in a rather blunt way) principles of good government. But the [antitrust acts are] not directed to that end." *Omni,* 499 U.S. at 378, 111 S.Ct. at 1353. *See also* Julian O. van Kalinowski, Peter Sullivan & Maureen McGuirl, 3 ANTITRUST LAWS AND TRADE REGULATION § 50.04[1] at p. 50–50 ("the Court's intimation that other laws are more suited to police corruption in the political arena suggests that the Court views *Noerr* as protecting all corrupt or illegal practices in petitioning the government."); Steven Semeraro, *Demystifying Antitrust State Action Doctrine,* 24 Harv. J.L. & Pub. Pol. 203 (*Omni* makes clear that law must be assumed to be in public interest even when government actors betray trust, for example, by bribery).

Additionally, the Court does not find plaintiff's argument, that the conduct involved in this matter did not involve government activity, compelling. Plaintiff does accurately cite *Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 208 F.3d 885 (10th Cir.2000) (*en banc*) for the rule that *Noerr–Pennington* does not apply absent government involvement. However, *Cardtoons* was a state law tort action between "purely private parties", involving no government entities. Likewise, plaintiff's reliance on *Primetime 24 Joint Venture v. National Broadcasting Co.,* 219 F.3d 92 (2d Cir.2000) is unavailing as that case was decided under the sham exception to *Noerr–Pennington,* which is not applicable in this case. Thus, those cases do not control here.

Indeed, from the face of plaintiff's complaints, the motivation behind the "corruption" as labeled by plaintiff, or "lobbying" as denominated by defendants, was to influence a state administrative body, the Riverboat Gaming Commission. In other words, the corporate defendants acted Governor Edwards hoping to use the Governor's political influence to persuade the Commission to vote in a certain manner. Because those allegations "clearly challenge how [a state body] operates, they necessarily implicate" *Parker* and *Noerr–Pennington. Ehlinger & Associates v. Louisiana Architects Assoc.,* 989 F.Supp. 775, 780–84 (E.D.La.1998), *aff'd* 167 F.3d 537 (5th Cir.).

*Ehlinger* illustrates why this Court finds defendants immune from antitrust liability. In that case, plaintiff Ehlinger sued the Louisiana Architects Association ("LAA"), a private organization, alleging that the LAA controlled the state entity charged with awarding state architectural contracts. Similarly to the case before this Court, Ehlinger did not sue the state body and claimed damages based on the state's failure to award him contracts. Granting summary judgment in favor of defendants, the court held that the private organization immune under both *Parker* and *Noerr–Pennington* because plaintiff alleged "nothing more than allegations that the LAA sought to influence [the state entity] and succeeded." *Id.* at 785. Astoria's allegations are quite similar. It seeks to hold defendants liable for attempting to politically influence how the state gaming bodies awarded CPA's and licenses. As such, this Court reaches the same result as *Ehlinger.*

Thus, as to Edwin Edwards' *Parker* immunity, the initial allegation is that he selected all members of the Gaming Commission as well as the head of the State Police. Although pursuant to law, the plaintiff's point is that Edwards selected only those whom he could politically control so that he could substitute his own will for that of the Gaming Commission and Division in deciding what applicants received approval. Thus, insofar as plaintiff alleges that the Edwards controlled the Gaming Commission, it is in that he filled the Commission with those he could ma-

nipulate. Edwards' acts in selecting the committee, sanctioned by state law, are clearly protected by *Parker* as are his subsequent meetings with various members. To look behind the actual effect of the Governor Edwards' decision in selecting Gaming Commission members and to scrutinize the motivations behind their votes would require a second guessing analysis that *Parker* and *Omni* seek to avoid. The complaints depict an executive official voicing a preference, that did not have to be obeyed, in the administrative process. The Gaming Commission, not Edwards, made the final decision, through a public vote, as to who received CPA's. Plaintiff's injury is thus caused by the sanctioned state action. The same reasoning that would permit liability in a case such as this would impose liability on a Governor for advocating an anticompetitive bill to a legislature, or vice versa. The lesson of *Omni* is not to look behind the officials' motives in acting as they did. As such, Edwards is immune under *Parker*.

■ To the extent that plaintiff argues that Edwards was acting beyond his authority as a state official, the Court finds that, in his individual capacity, Edwin Edwards is entitled to *Noerr–Pennington* immunity from suit for attempts to influence state bodies. *See Bayou Fleet, Inc. v. Alexander*, 26 F.Supp.2d 894 (E.D.La. 1998) (parish councilman's activities to persuade other government bodies immune); *Erie Builders Concrete Co. v. Erie–Western Pennsylvania Port Authority*, 705 F.Supp. 1125 (W.D.Pa.1989) (*Noerr–Pennington* protects unofficial activities of state officials); *Chambers Dev. Co., Inc. v. Municipality of Monroeville*, 617 F.Supp. 820 (W.D.Pa.1985) (same); *Lockary v. Kayfetz*, 587 F.Supp. 631 (N.D.Cal.1984) (same).

■ As to *Noerr–Pennington* protection for the remaining antitrust defendants, the Fifth Circuit's most recent pronouncement on the issue requires the Court to find immunity in this case. In *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852 (5th Cir.2000), the Court of Appeals held that it was appropriate to find a private party immune when that party enlisted a local politician to advance his cause before several local government bodies. The court reiterated that "[t]he Supreme Court has clearly stated that efforts to influence public officials will not subject individuals to liability, even when the sole purpose of the activity is to drive competitors out of business." *Id.* at 861 (citations omitted). As such, immunity is required for all political acts even when the conduct was retaliatory and the official argued before public bodies to which he did not belong. *Bayou Steel* supports dismissal of the antitrust cause of action because the complaints reveal nothing more than the corporate defendants' attempts to persuade political figures or bodies to act in their favor.

*Omni* teaches that criminal activity in the political realm is not governed by the antitrust laws. For all intents and purposes, then, the criminal conduct alleged can be classified simply as lobbying because the immunity doctrines do not distinguish between "lobbying" and "corruption." The logical conclusion to be reached is that attempts to influence government officials, such as the Gaming Commission and Enforcement Division are shielded from antitrust liability. The core principal to be followed is that parties who petition, lobby, or bribe the government for government action favorable to them cannot be prosecuted under the antitrust laws, even when the intent of the parties is corrupt and anticompetitive and the public official lobbies before branches of government that are not his own. Accordingly, there can be no antitrust liability for those at-

tempt to influence government bodies. After *Omni,* this Court sees no reason to limit the reach of the antitrust immunity, regardless of the alleged miasma that permeated the licensing process. Thus, Astoria's antitrust claim should also be dismissed because the federal antitrust laws do not impose liability for political activity. Thus, under *Noerr–Pennington* all antitrust defendants are immune from Clayton and Sherman Act liability for the political manipulation alleged by plaintiff.

## B. The RICO Claim

### 1. Statute of Limitations

■ Although the RICO statute does not contain a statute of limitations, the Supreme Court has held that the four year statute of limitations of the Clayton Act is analogous and therefore applicable to federal racketeering causes of action. *Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Therefore, the arguments advocated by the respective parties are essentially the same as those discussed in the antitrust context, the battle being over the point in time that plaintiff was injured and discovered its injury. Because of the Racketeer Influenced and Corrupt Organization Act's unique "pattern of racketeering activity" requirement, the development of accrual theories for RICO causes of action has taken a somewhat different path to reach today what is by and large the same rule as that applied in antitrust law.

In the RICO context, defendants point out that, at one time, the Circuits applied three different standards in determining the beginning point for the running of the limitations period; those standards being the "last predicate act" rule, the "injury and pattern discovery" rule, and the "injury discovery" rule. The choices were narrowed to two by the Court in *Klehr v. A.O.*

*Smith Corp.,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) when the Supreme Court struck down the "last predicate act" rule. *Id.* Three years later, *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000), further narrowed the available accrual options by rejecting the "injury and pattern discovery" rule. Thus, as in the antitrust context, the applicable rule is "injury discovery rule." Defendants also rely upon the Fifth Circuit's pronouncement in *Love v. National Medical Enterprises,* 230 F.3d 765 (5th Cir.), *rehearing denied* 239 F.3d 367 (5th Cir. 2000) where the Fifth Circuit adopted the "separate accrual rule", making arguments substantially similar to those previously discussed in the antitrust context. Defendant's argument is that plaintiff was injured in 1993 when it was denied a CPA for the Gretna berth and made aware of the basis for denial by members of the Gaming Commission. As such, they argue that plaintiff's cause of action has prescribed.

Plaintiff maintains that it was not injured until all licenses and CPA's were awarded, which did not occur until 1997, or until the conspiracy was exposed via the criminal indictments in 1998. Attempting to minimize its knowledge in 1993, plaintiff claims that it was only aware of "soft core" corruption in 1993. However, the "hard core" corruption did not become obvious until 1998 when the government indictments came down. Accordingly, plaintiff argues that it had no reason to move forward until it discovered the "hard core" corruption. Again, plaintiff does not seek to fit under the separate accrual rule, but rather argues that it was not injured at all until at least four years after it was denied a CPA.

In *Klehr v. A.O. Smith Corporation,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), plaintiff dairy farmers purchased a

feed silo from the defendants. Defendants represented that the silo had special features which would prevent the feed from molding and lead to healthier cows and better milk. Plaintiff's purchased the silo in 1974 but did not look at the walls of the silo until 1991. Plaintiff's RICO suit was dismissed based on the statute of limitations, and it sought certiorari to the Supreme Court, arguing that under the "last predicate act" rule, plaintiff's action was timely. The content of that rule was "as long as [defendant] committed one predicate act within the limitations period (i.e., the four years preceding suit), [plaintiffs] can recover, not just for any added harm . . . caused by that late-committed act, but for all the harm caused them by all the acts that make up the total pattern." *Id.* at 186–87, 117 S.Ct. at 1989.

The Court held that the last predicate act rule is "not a proper interpretation of the law" because it created a longer limitations period than contemplated by Congress. *Id.* In making this finding, the Court expressly repudiated any analogy between the civil and criminal provisions of RICO, as the criminal context does employ a last predicate act rule. The Court relied heavily upon the Clayton Act analogy,[9] which finds that a cause of action accrues and the limitations period begins to run when "a defendant commits an act which injures plaintiff's business." *Id.* at 188, 117 S.Ct. at 1990 (*quoting Zenith* and others). The Court reasoned that to follow a last predicate act rule would conflict with the "continuing violation" doctrine of antitrust law, which is that each new injury starts a new limitations period for that injury, but does not encompass injuries that occurred outside the limitations period.

With respect to plaintiff's fraudulent concealment argument, the Court held that plaintiff was not diligent in investigating its injuries and therefore not entitled to a tolling of the statute. Again relying on the antitrust analogy, the Court reasoned that

[I]n both [the Clayton act and RICO] contexts, private civil actions seek not only to compensate victims but also to encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity. That being so, we cannot say that the fraudulent concealment is concerned only with the behavior of the defendants. For that reason, and in light of the consensus of authority, we conclude that fraudulent concealment in the context of civil RICO embodies a due diligence requirement.

*Id.* at 195–96, 117 S.Ct. at 1993 (internal quotations and citations omitted).

In *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000), a unanimous Court narrowed the available options further, holding that the "injury and pattern discovery" rule, which proposed that a civil RICO claim accrues only when a claimant discovers both an injury and a pattern of racketeering activity, cannot govern civil RICO actions. In *Wood,* plaintiff was admitted to a mental hospital in 1985 and discharged in 1986. In 1994 the facility's parent company pleaded guilty to criminal fraud; Rotella was aware of the plea. In 1997, plaintiff filed his RICO claim, alleging that he was hospitalized for an extended time as a result of a conspiracy among the hospital and the doctors to maximize their profits. The Court acknowledged that federal courts typically apply a discovery accrual rule when statutes are silent but emphasized

**9.** In a concurring opinion, Justice Scalia stated that when the Court adopts a statute of limitations from another federal statute, it should adopt it in whole with all its rules of accrual, interruption, etc.

that "in applying a discovery accrual rule, **we have been at pains to explain that discovery of the injury, not discovery of the other elements of the claim, is what starts the clock.**" *Id.* at 555, 120 S.Ct. at 1081 (emphasis added). The Court rejected plaintiff's argument that a more lenient accrual rule is required in RICO claims because of their complexity and generally concealed and fraudulent nature. *Id.* at 556, 120 S.Ct. at 1081. Again the Court looked to the overall purpose of the civil enforcement provision of RICO and the Clayton Act, stating that

> Both statutes share a congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respective prohibited practices. The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, private attorneys general, dedicated to eliminating racketeering activity... It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize.

*Id.* at 557–58, 120 S.Ct. at 1082 (internal citations and quotations omitted). As to Rotella's argument that he would have been unable to plead a cause of action with particularity, the Court stated that Rule 11(b)(3) and the doctrine of equitable tolling would provide a sufficient safeguard.

It is worth noting that the *Rotella* and *Klehr* Courts did not establish the "injury discovery" rule as the final rule for accrual of RICO causes of action. Instead they merely rejected two rules (last predicate act and injury and pattern discovery) that it held were incompatible with the Clayton Act and RICO's emphasis on swift action to be taken for the public good and to aid the Government. *See Rotella* at 554, n. 2, 120 S.Ct. at 1080, n. 2. In that footnote, the

Court expressed a willingness to accept a more stringent accrual rule, such as the "injury occurrence" rule espoused by Justice Scalia in his concurring opinion in *Klehr*, under which discovery of one's injury would be irrelevant.

■■■■ In *Love v. National Medical Enterprises, et al.,* 230 F.3d 765 (5th Cir. 2000), the Fifth Circuit adopted a variant of the "injury discovery" rule, known as the "separate accrual" rule. The rule is largely based upon the Clayton Act's continuing conspiracy doctrine and the RICO "pattern" requirement, and holds that "[w]hen a pattern of RICO activity causes a continuing series of separate injuries, ... a civil RICO claim accrue[s] for each injury when the plaintiff discovers, or should have discovered, that injury." *Id.* at 773 (*citing Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir. 1988)). Again, as with the continuing conspiracy doctrine, the rule requires that the plaintiff be injured more than once, and the cause of action exists only for that injury occurring within the limitations period. *See Prieto v. John Hancock Mutual Life Insurance Co.,* 132 F.Supp.2d 506 (N.D.Tex.2001) (citations omitted).

■■ The accrual analysis under RICO is substantially similar to that discussed in the antitrust context and need not be repeated with the same detail here. Nonetheless, in this case Astoria discovered its injury at the June 18, 1993 meeting when it was denied a CPA despite its contention that it had the most local support in Gretna and an application superior to that of other candidates. It learned the source of its injury in July 1993, when Commissioners Gilliam and Landry confirmed that Astoria was entitled to receive a CPA but that they would not receive one. This fact was confirmed beyond all doubt by May 1994 at the extreme when all licenses were awarded to other candidates. As of July

1993 plaintiff learned that Gilliam was unable to support the application because he was "threatened" and "in a political position" which required him to participate in the scheme of the enterprise as instructed by Tarver, and that his own best judgment was compromised as to which applicants receive CPA's Original Complaint at ¶ 41. Similarly, Landry told a principal of Astoria that the Gretna Belle was unsuccessful because the principal "didn't get the man to turn the key," referring to Edwin Edwards. Original Complaint at ¶ 42. Based on those representations, Astoria certainly should have been aware that, at the very least, Gilliam, Landry, Tarver and Edwards acted in concert to deprive it of a CPA. Instead of acting diligently to uncover what was obviously at least questionable activity, Astoria sat on its hands and waited for the Government to investigate, indict and prosecute those it suspected from the start. Indeed, Astoria did not even take the step of availing itself of the administrative appeal process provided by Louisiana law. Waiting for the Government to initiate prosecution and essentially using the indictment to establish RICO standing is hardly acting as a "private attorney general" as contemplated by the civil RICO provisions.

Plaintiff's argument that it only knew of the illegal nature of the alleged racketeering activity when the criminal indictments were handed down is an attempt to use the "pattern discovery rule" that has been expressly repudiated by *Rotella*. As the Court stated "[t]o allow a pattern discovery rule would patently disserve the congressional objective of a civil enforcement scheme parallel to the Clayton Act regime, aimed at rewarding the swift who undertake litigation in the public good." *Id.* at 559, 120 S.Ct. at 1075. Indeed, plaintiff's dilatory tactics in waiting for the Government to complete its investigation and issue indictments, and then simply incorporating that information to assert its own private action is a far cry from the Supreme Court's stated purposes of civil actions, that is to aid the government and public by taking prompt action. As stated above in connection with the continuing conspiracy doctrine, the separate accrual rule does not save plaintiff. When plaintiff was denied a CPA in 1993, it suffered an injury that made it impossible to obtain a riverboat license. The severity of this injury was made obvious and final, at the very latest, when all licenses were awarded by May 1994 and plaintiff did not receive one. The separate accrual rule does not save plaintiff because the acts alleged to have occurred within the limitations period did not injure plaintiff as it was already out of the competition. Plaintiff consistently pleads that it was injured in that it did not receive a CPA even though it had the best application in the field and that this denial deprived it of the right to obtain a license. Plaintiff discovered this injury on June 18, 1993 and was even advised of the source of this injury by the end of July 1993. Plaintiff was aware that all licenses were awarded to other parties by May 1994. Therefore, plaintiff's RICO cause of action is barred by the statute of limitations.

## C. Pendent State Law Claims

 This Court's finding that plaintiff has no viable claims under federal law deprives this Court of the foundation for its subject matter jurisdiction. Although the several state law counts were properly asserted pursuant 28 U.S.C. § 1367, the Court must decide whether to retain those causes of action pursuant to its pendent jurisdiction. Pendent jurisdiction is a "doctrine of discretion, not of plaintiff's right." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) (*quoting Mine*

*Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Although there are several factors to consider in making this determination, the Court has instructed that "when the federal claims have dropped out of the lawsuit in its early stages and only state law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.; See also Parker & Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580 (5th Cir.1992) (general rule is to dismiss pendent state claims after federal claims dismissed); *Rhyne v. Henderson County,* 973 F.2d 386, 395 (5th Cir.1992) (district court properly dismissed state claims after dismissal of federal questions); *Rahr v. Grant Thornton LLP,* 142 F.Supp.2d 793 (N.D.Tex.2000) (same). Thus, federal courts should avoid deciding needless decisions of state law. *Noble v. White,* 996 F.2d 797 (5th Cir.1993) (*citing Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

Here, the two federal claims have been dismissed at an early stage of the litigation. Five state law claims remain, and at least two of those claims (Counts I and II) involve novel issues of state law. Moreover, a state lawsuit is pending involving many of the same defendants. Based on these factors, judicial economy, convenience, fairness and comity require this Court to dismiss the pendent state law claims as well. Accordingly,

**IT IS ORDERED** that the RICO and Federal Antitrust claims are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that all state law claims are **DISMISSED WITHOUT PREJUDICE.**